**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
10/23/2020

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TAILORED BRANDS, INC., *et al.*,[1] | ) Case No. 20-33900 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No.  752** |

**ORDER AUTHORIZING (I) THE SALE OF CERTAIN OF
THE DEBTORS' REAL PROPERTIES FREE AND CLEAR OF
LIENS, CLAIMS, AND ENCUMBRANCES AND (II) THE DEBTORS TO
ENTER INTO AND PERFORM UNDER THE PURCHASE AGREEMENT**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing (i) the private sale of the Properties free and clear of any liens, claims, and encumbrances and (ii) the Debtors to enter into and perform under the Purchase Agreement and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration and the Etlin Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/TailoredBrands.  The location of the Debtors' service address in these chapter 11 cases is:  6100 Stevenson Boulevard, Fremont, California 94538.

[2]   Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

### I.      Approval of the Sale and Entry into the Purchase Agreement.

1.      In accordance with section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 and as described in the Motion, the Debtors are authorized to sell the Properties to the Purchaser in accordance with the terms and conditions set forth in the Purchase Agreement, attached hereto as **Schedule 1**.

2.      The Purchase Agreement, together with all annexes, exhibits, and amendments thereto, is hereby approved; *provided, however*, that any real estate commission or finders' fee owed to the Debtors' agent, CBRE, Inc., pursuant to Section 6.5 of the Purchase Agreement, shall be paid only upon the entry of an order authorizing the Debtors' retention and employment of CBRE, Inc.

3.      Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

4.      The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of section 363(m) of the Bankruptcy Code.

5.      The Purchase Agreement represents a fair and reasonable offer to purchase the Properties under the facts and circumstances of these chapter 11 cases.

6.     Approval of the Purchase Agreement and the consummation of the transaction contemplated thereby is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

7.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Properties outside of a plan of reorganization.

8.     The Debtors are authorized and empowered to take any and all actions necessary or appropriate to:  (a) consummate the sale of the Properties to the Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (b) close the sale of the Properties as contemplated in the Purchase Agreement and this Order (including any customary or immaterial modifications to purchase price); and (c) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the sale of the Properties, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.

## II.    Transfer of the Properties.

9.     The Debtors are authorized to sell the Properties free and clear of liens, claims, and encumbrances against the Debtors or their estates, because one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.

10.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the sale of the Properties under the terms and conditions set forth in the Purchase Agreement shall be free and clear of any and all liens, claims, encumbrances, and other interests of any kind or nature whatsoever that do not constitute "Permitted Exceptions" (as defined in the Purchase

Agreement), with all such liens, claims, encumbrances, and other interests to attach to the proceeds of the sale with the same validity, in the order of their priority, with the same force, effect, and validity that they had immediately prior to the entry of this Order, subject to any rights, claims, or defenses the Debtors may have with respect thereto.

11.     Notwithstanding anything to the contrary in this Order or in the Purchase Agreement, the terms of the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 512] (the "Final DIP Order") shall govern with respect to the proceeds of the sale of the Properties, including but not limited to the terms governing the application of DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims (each as defined in the Final DIP Order) to such proceeds, and all such proceeds shall be utilized solely in accordance with the Budget (as defined in the Final DIP Order).

12.     All persons and entities holding liens or interests in the Properties arising under, out of, in connection with, or in any way relating to the Debtors, the Properties or the transfer of the Properties to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser or its successors or assigns, its property or the Properties, such persons' or entities' liens or interests in and to the Properties.

13.     Notwithstanding any provision of the Purchase Agreement to the contrary, after the closing of the sale of the Properties, the Debtors shall have no further liability with respect to the Properties, and any claims, whether administrative or otherwise, relating to or arising from

the Properties after the closing of the sale and transfer of possession of the Properties that are asserted against the Debtors shall be deemed disallowed.

14.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the liens and other encumbrances of record.

15.     If any person or entity which has filed statements or other documents or agreements evidencing liens on, or interests in, the Properties shall not have delivered to the Debtors prior to the closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to the Properties, the Debtors are hereby authorized and directed, and the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Properties.

16.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

### III.    Other Provisions.

17.    The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or the rights of any party holding a lien, claim or encumbrance on or against the Properties.

18.    All time periods set forth in this Order and the Purchase Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a).

19.    The stay provided for in Bankruptcy Rules 6004(h) is hereby reduced to the extent necessary to permit closing of the sale of the Properties.  This Order shall otherwise be effective immediately upon its entry.

20.    To the extent there is any inconsistency between the terms of the Purchase Agreement, the Motion, and this Order, the terms of this Order shall govern.    To the extent there is any inconsistency between the terms of the Purchase Agreement, this Order and the Final DIP Order, the Final DIP Order shall govern.

21.    Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or this Order or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity,

priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief authorized in this Order are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

22.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

23.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

24.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

25.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

26.     This Order shall be binding upon the Purchaser and all successors and assigns of the Purchaser, the Debtors, their estate, all creditors of and holders of equity interests in the Debtors, and any holders of liens against or on all or any portion of the Properties.  This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and their respective successors and assigns.

  Signed:  October 23, 2020

                                                    Marvin Isgur
                                       United States Bankruptcy Judge

7

## Schedule 1

**Purchase Agreement**

**Execution Version**

# AGREEMENT OF PURCHASE AND SALE

### BY AND BETWEEN

## THE MEN'S WEARHOUSE, INC.

### AS SELLER

### AND

## MCCORVEY REAL ESTATE HOLDINGS, LTD.

### AS BUYER

SEPTEMBER 30, 2020

FOR

**5803 GLENMONT DRIVE**
**Houston, Texas**

**5630 RENWICK DRIVE**
**Houston, Texas**

ARTICLE I       DEFINITIONS

    Section 1.1.     Definitions.........................................................................1
    Section 1.2.     Terms Generally..............................................................3

ARTICLE II      PURCHASE AND SALE OF PROPERTY

    Section 2.1.     Sale...................................................................................3
    Section 2.2.     Purchase Price.................................................................4
    Section 2.3.     Escrow Instructions.........................................................6

ARTICLE III     BUYER'S EXAMINATION OF THE PROPERTY; AS-IS SALE

    Section 3.1.     Due Diligence Materials .................................................6
    Section 3.2.     Buyer's Independent Investigation .................................6
    Section 3.3.     Entry, Insurance and Indemnity; Limits ........................8
    Section 3.4.     AS-IS SALE.....................................................................9

ARTICLE IV     TITLE AND SURVEY MATTERS

    Section 4.1.     Delivery; Objections .....................................................11
    Section 4.2.     No New Exceptions .......................................................14
    Section 4.3.     Evidence of Title...........................................................14

ARTICLE V      INTERIM OPERATION OF THE PROPERTY

    Section 5.1.     Interim Operation of the Property..................................14
    Section 5.2.     Leasing Costs.................................................................14
    Section 5.3.     Seller's Maintenance of the Property.............................15
    Section 5.4.     Lease Enforcement.........................................................15
    Section 5.5.     Tenant Notices ...............................................................15
    Section 5.6.     Risk of Loss and Insurance Proceeds............................16
    Section 5.7.     Condemnation and Eminent Domain..............................16
    Section 5.8.     Contracts........................................................................17
    Section 5.9.     Notifications..................................................................17

ARTICLE VI     REPRESENTATIONS AND WARRANTIES

    Section 6.1.     Representations and Warranties of Seller ......................17
    Section 6.2.     Changes in Seller Representations/Waiver.....................18
    Section 6.3.     Survival of Seller Representations and Warranties ........19
    Section 6.4.     Representations and Warranties of Buyer......................20
    Section 6.5.     Brokers...........................................................................21

ARTICLE VII    CLOSING, DELIVERIES AND PRORATIONS

    Section 7.1.     Closing ..........................................................................21
    Section 7.2.     Estoppel Certificates .....................................................21
    Section 7.3.     Deposit of Documents....................................................22
    Section 7.4.     Prorations ......................................................................23
    Section 7.5.     Security Deposits ...........................................................25
    Section 7.6.     Closing Costs .................................................................25

ARTICLE VIII    DEFAULT; REMEDIES

    Section 8.1.    Default by Seller ............................................................. 26
    Section 8.2.    Default By Buyer ............................................................. 26
    Section 8.3.    Limitations on Liability .................................................. 26
    Section 8.4.    Survival .......................................................................... 27

ARTICLE IX    PUBLICITY; CONFIDENTIALITY

    Section 9.1.    Publicity ......................................................................... 27
    Section 9.2.    Confidentiality ............................................................... 27

ARTICLE X    MISCELLANEOUS

    Section 10.1.    Notices ........................................................................... 28
    Section 10.2.    Entire Agreement ........................................................... 29
    Section 10.3.    Time ............................................................................... 29
    Section 10.4.    Attorneys' Fees .............................................................. 30
    Section 10.5.    No Merger ...................................................................... 30
    Section 10.6.    Assignment .................................................................... 30
    Section 10.7.    1031 Exchange ............................................................... 30
    Section 10.8.    Governing Law; Jurisdiction and Venue ........................ 30
    Section 10.9.    Uniform Vendor and Purchaser Risk Act Not Applicable ................ 31
    Section 10.10.    Notice to Buyer Regarding Restrictive Covenants ........... 31
    Section 10.11.    Interpretation of Agreement ............................................ 31
    Section 10.12.    Amendments ................................................................... 31
    Section 10.13.    No Recording ................................................................. 32
    Section 10.14.    No Third Party Beneficiary ............................................. 32
    Section 10.15.    Severability .................................................................... 32
    Section 10.16.    Drafts not an Offer ......................................................... 32
    Section 10.17.    Further Assurances ......................................................... 32
    Section 10.18.    Counterparts; Signatures ................................................. 32

**EXHIBITS**

EXHIBIT A   DEEDS
EXHIBIT B   ESCROW INSTRUCTIONS
EXHIBIT C   ASSIGNMENT AND ASSUMPTION OF LEASES
EXHIBIT D   ASSIGNMENT OF CONTRACTS, WARRANTIES, GUARANTIES, PERMITS
              AND LICENSES
EXHIBIT E   TENANT ESTOPPEL CERTIFICATE
EXHIBIT F   TENANT NOTICE LETTER

**SCHEDULES**

SCHEDULE 2.1.1   PROPERTY LEGAL DESCRIPTION

SCHEDULE 6.1(f)   LEASING COMMISSION AGREEMENTS

## AGREEMENT OF PURCHASE AND SALE

**THIS AGREEMENT OF PURCHASE AND SALE** (this "**Agreement**"), dated as of September 30, 2020 (the "**Effective Date**"), is between **THE MEN'S WEARHOUSE, INC.**, a Texas corporation ("**Seller**"), and **MCCORVEY REAL ESTATE HOLDINGS, LTD.**, a Texas limited partnership ("**Buyer**").

Buyer desires to purchase the Property (as defined below) from Seller and Seller desires to sell the Property to Buyer, all as more particularly set forth in this Agreement. In consideration of the payments and mutual promises set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1.   Definitions**.   In addition to any other terms whose definitions are fixed and defined elsewhere in this Agreement, the following terms, when used in this Agreement with a capital letter, have the meanings set forth below:

"**Affiliate**" means with respect to any Person any other Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such Person.

"**Business Day**" means any day other than a Saturday, a Sunday, or a federal holiday recognized by the Federal Reserve Bank of New York.

"**Buyer**" means the Person identified as such in the first paragraph of this Agreement and will also include any Permitted Assignee (as defined in Section 10.6).

"**Claim Notice**" means a written notice delivered by Buyer to Seller setting forth a reasonably detailed description of the specific Claim or Claims being asserted, including without limitation detailed statements of (i) the amount of loss or damage being asserted and (ii) the rationale for or explanation of why the Claim is alleged to be the responsibility of Seller.

"**Claims**" means any suits, legal actions, administrative orders, proceedings, investigations, obligations, demands, claims, liabilities, fines, penalties, liens, judgments, losses, injuries, damages, punitive damages, expenses or costs, including without limitation attorneys' and experts' fees and costs and investigation, remediation costs, losses due to impairment or diminished value, or any other losses or costs of any type or kind.

"**Closing**" means the consummation of the transactions contemplated hereby.

"**Closing Documents**" means the documents, instruments (including, without limitation, any deeds or assignments) and other agreements executed and delivered at or in connection with the Closing.

"***Code***" means the Internal Revenue Code of 1986, as amended, or any corresponding provision(s) of any succeeding law.

"***Due Diligence Materials***" means all of the documents and other materials provided by or on behalf of Seller to Buyer and its Representatives prior to and during the Due Diligence Period.

"***Existing Leases***" means those leases, license agreements and occupancy agreements, together with any and all amendments and/or modifications thereto, identified in the Seller Deliveries, as the same may be amended or modified from time to time in accordance with the terms of this Agreement, but shall in no event include those leases, if any, in default with all rights to possession having been terminated prior to the Effective Date and with tenants under such leases being referred to in this Agreement as "**Defaulting Tenants**".

"***Governmental Authority***" means any federal, state, county or municipal government, or political subdivision thereof, any governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court or administrative tribunal.

"***Hazardous Materials***" means materials, wastes, or substances that are (A) included within the definition of any one or more of the terms "hazardous substances," "hazardous materials," "toxic substances," "toxic pollutants," and "hazardous waste" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901, *et seq.*), the Clean Water Act (33 U.S.C. Section 1251, *et seq.*), the Safe Drinking Water Act (14 U.S.C. Section 1401, *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801, *et seq.*), and the Toxic Substance Control Act (15 U.S.C. Section 2601, *et seq.*) and the regulations promulgated pursuant to such laws, (B) regulated, or classified as hazardous or toxic, under federal, state or local environmental laws or regulations, (C) petroleum, (D) asbestos or asbestos-containing materials, (E) polychlorinated biphenyls, (F) flammable explosives or (G) radioactive materials.

"***Leases***" means all Existing Leases and New Leases, collectively.

"***Leasing Costs***" means third party leasing commissions payable in connection with the Leases and the cost of tenant improvement work and tenant allowances which the landlord is required to pay or provide under the terms of the Leases.

"***New Leases***" means those leases, license agreements and occupancy agreements encumbering the Property which are entered into after the Effective Date in accordance with the terms of this Agreement, as the same may be amended or modified from time to time in accordance with the terms of this Agreement.

"***Obligations Surviving Termination***" means those provisions of this Agreement which, by their express terms, survive the termination of this Agreement.

"***Person***" means any individual, partnership, joint venture, corporation, trust, limited liability company, unincorporated association, any other entity and any government or any department or agency thereof, whether acting in an individual, fiduciary or other capacity.

"***Real Estate Taxes***" means all real estate taxes and assessments applicable to the Property, including all installments of special taxes or assessments.

"***State***" means the State in which the Real Property is located.

"***Tenant(s)***" means a tenant, occupying or licensing the Property under any Lease.

**Section 1.2.  Terms Generally**.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)     the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(b)     the meanings of defined terms will be applicable equally to the singular and plural of the terms defined; and

(c)     the words "including" and "include" and other words of similar import will be deemed to be followed by the phrase "without limitation".

**ARTICLE II**
**PURCHASE AND SALE OF PROPERTY**

**Section 2.1.  Sale**.  Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, subject to the provisions, terms, covenants and conditions set forth in this Agreement, all of Seller's right, title and interest in and to the following:

(a)     the real property located at 5803 Glenmont Drive and 5630 Renwick Drive, as is legally described on Schedule 2.1.1 attached hereto, together with any and all rights, privileges and easements appurtenant thereto owned by Seller, including any and all rights, title and interest of Seller, if any, in and to oil, gas and other mineral rights pertaining to the Land (collectively, the "**Land**"), together with the improvements and fixtures (other than fixtures owned or removable by any Tenant or third party) located thereon (collectively, the "**Improvements**"; the Land, together with the Improvements thereon, the "**Real Property**");

(b)     all tangible personal property owned by Seller and located on and used in connection with management, operation or maintenance of the Real Property or attached to the Real Property, if any, but specifically excluding any inventory owned by Seller or any of Seller's Affiliates (the "**Personal Property**");

(c)     (i) Seller's interest, as landlord, in each of the Existing Leases, (ii) Seller's interest, as landlord, owner or licensor, in any New Leases and (iii) Seller's rights under any guarantees, letters of credit or other instruments that secure or guarantee the performance of the obligations of any Tenant;

(d)     Subject to <u>Section 5.9</u> hereof and to the extent assignable, all service contracts, maintenance contracts, parking contracts, equipment leases, and like contracts and agreements entered into by Seller and exclusively relating to the Real Property, if any (collectively, and including any amendments or modifications thereto, the "**Contracts**"), but "Contracts" will exclude any management, listing or leasing agreements in effect for the Property;

(e)     to the extent assignable, all warranties and guaranties made by any third party for the benefit of Seller or received by Seller from any third party with respect to any building, building component, structure, fixture, machinery, equipment or material situated on the Real Property, or contained in or comprising a part of any Improvement, if any (collectively, the "**Warranties**");

(f)     to the extent Seller currently has such items in its possession or control, all preliminary, final and proposed building plans and specifications (including "as-built" floor plans and drawings) and tenant improvement plans and specifications for the Improvements and any leasehold improvements made by any Tenant, if any (collectively, the "**Plans**");

(g)     to the extent transferable, any transferable licenses, permits, certificates of occupancy, approvals, and entitlements issued, approved or granted by Governmental Authorities in connection with the ownership, use or operation of the Real Property or the Personal Property, if any (collectively, the "**Permits and Licenses**"); and

(h)     All of Seller's right, title and interest in and to all construction, operating and reciprocal easement agreements, master declaration agreements and detention basin easement agreements affecting the Property, if any (collectively, the "**REAs**"), but excluding any insurance, indemnity, or other claims or rights with respect to the REAs arising prior to Closing.

The Real Property, together with the Personal Property, the Leases, the Contracts, the Warranties, the Plans, the Permits and Licenses and the REAs relating thereto, are hereinafter collectively referred to as the "**Property**." For the avoidance of doubt, the Property expressly excludes any intangible property not listed above, including, without limitation, (1) proprietary computer equipment, software and systems, (2) rights to use the legal names of Seller or any of Seller's Affiliates in any manner and (3) insurance, indemnity, or other claims or rights with respect to the Leases or the Property arising prior to Closing.

**Section 2.2.  Purchase Price**.

(a)     The aggregate purchase price for the Property is Twelve Million Four Hundred Thousand Dollars ($12,400,000) (the "**Purchase Price**"), subject to prorations, credits and adjustments as set forth herein.

(b)     Buyer will pay the Purchase Price as follows:

(i)     Within three (3) Business Days following the Effective Date, Buyer will deliver in escrow to Charter Title Company, 1717 West Loop South,

12th Floor, Houston, TX 77027, Attention: Cameron Franz (the "**Escrow Agent**") a certified or cashier's check or wired funds in the amount of Two Hundred Fifty Thousand Dollars ($250,000) (together with any interest earned thereon, but excluding the Independent Consideration described below, the "**Earnest Money**");

(ii)    The balance of the Purchase Price, as adjusted pursuant to the terms of this Agreement, will be deposited by Buyer, in immediately available funds, with the Escrow Agent and paid to Seller at the Closing; and

(iii)    Notwithstanding the foregoing, the sum of One Hundred Dollars ($100) out of the Earnest Money will be deemed to be independent consideration (the "**Independent Consideration**") for the execution of this Agreement by Seller. Such Independent Consideration is being paid to, and may be retained by Seller as separate and additional consideration for this Agreement and Seller's agreements and obligations hereunder, and not as part of the Earnest Money or of the Purchase Price. Such Independent Consideration is deemed earned by Seller as of the Effective Date of this Agreement and is nonrefundable in all events, but shall be applied to the Purchase Price at Closing, if and only if Closing occurs as set forth in this Agreement.

(c)    Seller and Buyer hereby instruct Escrow Agent to place the Earnest Money in a federally insured interest-bearing account on behalf of Seller and Buyer.  The Earnest Money will be applied as follows:

(i)    if Buyer cancels this Agreement on or before the expiration of the Due Diligence Period pursuant to Section 3.2(a), the Earnest Money (less the Independent Consideration) will be returned to Buyer;

(ii)    if after the Due Diligence Period Buyer cancels this Agreement when Buyer is expressly entitled to do so as provided in this Agreement, the Earnest Money (less the Independent Consideration) will be returned to Buyer, except for Two Hundred Fifty Thousand Dollars ($250,000), which portion of the Earnest Money shall be paid to Seller, except as expressly provided otherwise in this Agreement;

(iii)    if the Earnest Money is forfeited by Buyer to Seller as provided in this Agreement, the Earnest Money will be paid to Seller; and

(iv)    if escrow closes, the Earnest Money will be credited to Buyer, applied against the Purchase Price, and paid to Seller at Closing.

**Section 2.3.  Escrow Instructions**.  Seller and Buyer agree to the escrow instructions attached hereto as Exhibit B, and by this reference incorporated herein (the "**Escrow Instructions**"). This Agreement, together with the Escrow Instructions, shall constitute escrow instructions for the transaction contemplated herein. Such escrow instructions shall be construed as applying principally to Escrow Agent's employment. Seller and Buyer agree to execute such reasonable additional and supplementary escrow instructions as may reasonably be required by

Escrow Agent to enable the Escrow Agent to comply with the terms of this Agreement; provided, however, that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall control, unless a contrary intent is expressly indicated in such supplementary instructions and the same are signed by both Buyer and Seller.

**ARTICLE III**
**BUYER'S EXAMINATION OF THE PROPERTY; AS-IS SALE.**

**Section 3.1.  Due Diligence Materials.** Within five (5) Business Days after the Effective Date, Seller shall provide Buyer with access to the following via e-mail or, in the case of item (iii) below, at the applicable Property, in each case to the extent the same are in existence and are within Seller's possession or control and pertain to the Property (collectively, the "**Seller Deliveries**"): (i) the latest real and personal property tax bills from all taxing authorities, (ii) copies of all third party reports relating to the condition of the Improvements and the Real Property, (iii) copies of all Plans, (iv) copies of any service agreements, contracts, and warranties relating to the upkeep, repair, maintenance or operation of the Property, including the Improvements and the Personal Property, (v) copies of all operating licenses and permits, (vi) copies of any Existing Leases and amendments thereto affecting the Property along with any tenant financial information provided to Seller, (vii) a current rent roll of all Leases encumbering the Property, (viii) copies of all invoices for utilities for the Property for the three (3) months immediately preceding the Effective Date, (ix) a copy of Seller's most current operating statement for the Property as well as the two (2) most recent completed fiscal years, (x) copies of the City of Houston Life Safety and Occupancy Permits for the Property, (xi) copies of Seller's most recent insurance policies covering the Property or the declarations page thereof showing coverage and any endorsements limiting coverage, (xii) all tenant ledgers for the past two years, (xiii) a detailed list of any outstanding tenant improvement commitments or other outstanding lease concessions including free rent, (xiv) a general ledger detail report for maintenance and repairs for the past two years, (xv) a list of any outstanding indemnity, insurance or comparable obligations of Tenants under the Leases relating to claims or other events arising prior to the Effective Date, (xvi) all notices and/or correspondence for the three (3) years preceding the Effective Date from any government agency, engineer and /or contractor related to the condition of the Property and/or use of the Property, and (xvii) any other information regarding the Property that Buyer may reasonably request. Upon Seller's receipt or production of any Seller Deliveries after the initial delivery date specified above, Seller shall promptly furnish such Seller Deliveries to Buyer and shall continue to provide the same during the pendency of this Agreement.

**Section 3.2.  Buyer's Independent Investigation**.

(a)      Buyer will have the period from the Effective Date until the applicable times as are set forth in Section 3.2(d) (the "**Due Diligence Period**") within which to conduct any commercially reasonable, non-invasive investigations, studies or tests of the Property deemed necessary by Buyer. Buyer may terminate this Agreement by written notice to Seller (the "**Termination Notice**"), delivered on or prior to the expiration of the Due Diligence Period, for only five (5) reasons (all of which are in Buyer's sole and absolute discretion): (i) environmental concerns relating to testing undertaken by Buyer pursuant

to Section 3.3; (ii) title or survey matters as described in Section 4.1; (iii) condition of the Property; (iv) regulatory restrictions  or deed restrictions related to the use of the Property; and/or (v) access to utilities for service to the Property. If Buyer fails to timely deliver a Termination Notice prior to the expiration date of the Due Diligence Period, the Earnest Money will become nonrefundable to Buyer (except as expressly set forth otherwise in this Agreement), and this Agreement will continue in effect subject to the other provisions hereof. Buyer acknowledges and agrees that it is being given the full opportunity during the Due Diligence Period to inspect and investigate each and every aspect of the Property, either independently or through agents, representatives or experts of Buyer's choosing, as Buyer considers necessary or appropriate. Buyer acknowledges that any materials it receives for review from Seller pursuant to Section 3.1 are informational only and shall not give rise to a right of termination.

(b)     Seller will have no obligation to provide to Buyer any of Seller's attorney-client privileged materials, appraisals, internal memoranda, or internal evaluations of the Property prepared by or for Seller for internal use or for the information of the investors in Seller. Except as otherwise expressly set forth in this Agreement, Seller makes no representations or warranties of any kind regarding the accuracy, thoroughness or completeness of or conclusions drawn in the information contained in Seller's Deliveries or any other Due Diligence Materials.

(c)     Notwithstanding anything contained herein to the contrary, if this Agreement is canceled for any reason, Buyer shall promptly return to Seller or destroy, in each case as instructed by Seller, any Due Diligence Materials delivered to Buyer in connection with the Property.

(d)     The Due Diligence Period shall be bifurcated as follows:

(i)     for purposes of Section 3.2(a)(i) (environmental), (iii) (property condition), (iv) (regulatory restrictions), and (v) (utilities service), the period from the Effective Date until 5:00 p.m. Houston, Texas time, on the date that is twenty (20) days following the Effective Date; provided, however, that Buyer may extend the Due Diligence Period for purposes of Section 3.2(a)(i) by up to thirty (30) days upon written notice to Seller prior to the then-applicable expiration of the Due Diligence Period under this Section 3.2(d)(i) solely for the purpose of obtaining a Phase II Environmental Site Assessment in the event that the Phase I Environmental Site Assessment obtained by Buyer recommends that a Phase II Environmental Site Assessment be obtained; and

(ii)     for purposes of Section 3.2(a)(ii) (title/survey), the Due Diligence Period shall be a sum of days calculated as follows: (A) the earlier of twenty (20) days from the Effective Date and the number of days from the Effective Date until the date that Buyer and Seller receive the Survey as contemplated by Section 4.1(a) (either, the "**Survey Delivery Date**"); plus (B) the earlier of seven (7) days or the number of days from the Survey Delivery Date until the date that Buyer delivers a Title Objection Notice pursuant to Section 4.1(c); plus (C) the earlier of seven (7) days or the number of days from the date of the Title Objection Notice until the date that Seller delivers a response thereto pursuant to Section 4.1(d); plus (D) the earlier of five (5) days or the number of days from the date of Seller's response (or deemed

election not to remove Title Objection Matters) to the Title Objection Notice until the date that Buyer delivers a waiver of Title Objection Matters pursuant to Section 4.1(d). For the avoidance of doubt, (y) in no event shall the Due Diligence Period for title/survey matters extend beyond the period from the Effective Date until 5:00 p.m. Houston, Texas time on the date that is thirty-nine (39) days following the Effective Date and (z) if Buyer does not deliver a Title Objection Notice within the time required under to Section 4.1(c), the Due Diligence Period shall be deemed to have ended immediately.

**Section 3.3.  Entry, Insurance and Indemnity; Limits**.

(a)     In connection with any entry by Buyer, its Affiliates, its Permitted Assignee(s) or any of their agents, employees, contractors or other representatives (each a "**Buyer Party**", and collectively, the "**Buyer Parties**") onto the Real Property, Buyer must give Seller not less than two (2) Business Days' prior written notice of such entry and must coordinate the timing of such entry and any testing or inspections with Seller so as to minimize, to the greatest extent possible, any interference with the business of the Tenants. Buyer shall otherwise conduct such entry in a manner reasonably acceptable to Seller.  Seller has the right to have a representative present during all or any of Buyer's inspections and tests. In addition, Buyer shall provide Seller with at least two (2) Business Days' prior written notice of any interviews of any Tenants by Buyer or any other Buyer Party, and Seller has a right to have a representative present during all Tenant interviews.

(b)     Buyer shall not conduct any invasive testing, drilling, boring, or invasive environmental testing of the Real Property without the prior written approval of Seller, which approval may be withheld in Seller's sole and absolute discretion and may, if granted, be conditioned upon such precautions as Seller deems advisable to protect itself and the Property; provided, however Seller agrees that Buyer may perform customary Phase I Environmental Assessment testing on the Land. Without limiting the foregoing, prior to any entry to perform any necessary on-site testing, Buyer shall give Seller written notice of the identity of the company or persons who will perform such testing and the proposed scope of the testing and the party performing the testing. Seller shall approve or disapprove any proposed testing and the party performing the same within two (2) Business Days after receipt of such notice. If requested by Seller, Buyer shall promptly deliver to Seller copies of any reports relating to any testing or other inspection of the Real Property performed by or on behalf of any Buyer Party in the event that Buyer requests any action on the part of Seller as a result of such testing or the information contained in any such report.

(c)     Buyer shall maintain, and shall ensure that its contractors maintain, commercial general liability insurance insuring the Buyer Parties against any liability arising out of any entry or inspections of the Real Property pursuant to the provisions hereof.  Such insurance maintained by Buyer must be in the amount of One Million and No/100 Dollars ($1,000,000.00) combined single limit for injury to or death of one or more persons in an occurrence, and for damage to tangible property (including loss of use) in an occurrence, and an aggregate limit of at least Two Million and No/100 Dollars ($2,000,000.00). The policy maintained by Buyer must insure the contractual liability of

Buyer covering the indemnities herein and must (x) name Seller and the other Seller Parties (as hereinafter defined) as additional insureds with respect to all Claims arising out of the activities of the Buyer Parties in, about or with respect to the Property, (y) contain a cross-liability provision, and (z) contain a provision to the effect that the insurance provided by Buyer hereunder will be primary and noncontributing with any other insurance available to Seller. Buyer shall provide Seller with evidence of such insurance coverage prior to any entry or inspection of the Real Property.

(d)      Buyer shall pay all costs incurred in making any tests, surveys, analyses, and investigations of the Property, shall promptly repair and restore any damage caused by its tests and investigations, and shall not permit any mechanics or other liens to be filed against the Property as a result of such tests and investigations. Buyer will indemnify, defend and hold the Seller Parties harmless from and against any Claims arising out of the activities of Buyer and the other Buyer Parties in, about or with respect to the Property relating to or in the course of performing any inspections, testings or inquiries; provided, however, Buyer will not be responsible for any Claims arising out of the mere discovery of any pre-existing condition on the Property (environmental or otherwise).  The foregoing agreements shall survive the Closing or, if the Closing does not occur, the termination of this Agreement.

(e)      Notwithstanding any provision in this Agreement to the contrary, and except as may be required for Buyer to conduct a Phase I Environmental Site Assessment of the Property, prior to Closing neither Buyer nor any other Buyer Party may contact any Governmental Authority regarding any Hazardous Materials on or the environmental condition of the Real Property without Seller's prior written consent thereto.  In addition, and except as may be required for Buyer to conduct a Phase I Environmental Site Assessment of the Property, Seller is entitled to receive at two (2) Business Days' prior written notice of the intended contact and to have a representative present when Buyer has any such contact with any governmental official or representative.

**Section 3.4.  AS-IS  SALE**.   BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES  THAT,  EXCEPT  AS  SPECFICALLY  SET  FORTH  IN  THE  CLOSING DOCUMENTS  AND  IN  SELLER'S  REPRESENTATIONS,  WARRANTIES  AND COVENANTS SET FORTH IN THIS AGREEMENT, (1) SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY "AS IS, WHERE IS AND WITH ALL FAULTS" AND (2)  BUYER  IS  NOT  RELYING  ON  ANY  REPRESENTATIONS,  WARRANTIES, COVENANTS OR AGREEMENTS OF ANY KIND WHATSOEVER, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, FROM SELLER OR ANY SELLER PARTY AS TO ANY MATTER CONCERNING OR RELATING TO THE PROPERTY, OR SET FORTH, CONTAINED OR ADDRESSED IN THE DUE DILIGENCE MATERIALS (INCLUDING WITHOUT LIMITATION, THE COMPLETENESS THEREOF), INCLUDING WITHOUT LIMITATION:

(I) THE  QUALITY,  NATURE,  HABITABILITY,  MERCHANTABILITY,  USE, OPERATION,  VALUE,  MARKETABILITY,  ADEQUACY,  FITNESS  FOR  A PARTICULAR PURPOSE, OR PHYSICAL CONDITION OF THE PROPERTY OR ANY  ASPECT  OR  PORTION  THEREOF  (INCLUDING  WITHOUT  LIMITATION

9

STRUCTURAL ELEMENTS, FOUNDATION, ROOF, APPURTENANCES, ACCESS, LANDSCAPING, PARKING FACILITIES, ELECTRICAL, MECHANICAL, HVAC, PLUMBING, SEWAGE, AND UTILITY SYSTEMS, FACILITIES AND APPLIANCES, SOILS, GEOLOGY AND GROUNDWATER),

(II) THE DIMENSIONS OR LOT SIZE OF THE REAL PROPERTY OR THE SQUARE FOOTAGE OF THE IMPROVEMENTS THEREON OR OF ANY TENANT SPACE THEREIN OR COMMON AREAS THEREOF,

(III) THE DEVELOPMENT OR INCOME POTENTIAL, OR RIGHTS OF OR RELATING TO, THE PROPERTY, OR THE SUITABILITY, VALUE OR ADEQUACY OF THE PROPERTY FOR ANY PARTICULAR PURPOSE,

(IV) THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTY OR ANY OTHER PUBLIC OR PRIVATE RESTRICTIONS ON THE USE OF THE PROPERTY,

(V) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY APPLICABLE CODES, LAWS, REGULATIONS, STATUTES, ORDINANCES, COVENANTS, CONDITIONS AND RESTRICTIONS OF ANY GOVERNMENTAL AUTHORITY OR OF ANY OTHER PERSON OR ENTITY (INCLUDING, WITHOUT LIMITATION, THE AMERICANS WITH DISABILITIES ACT),

(VI) THE ABILITY OF BUYER TO OBTAIN ANY NECESSARY GOVERNMENTAL APPROVALS, LICENSES OR PERMITS FOR BUYER'S INTENDED USE OR DEVELOPMENT OF THE PROPERTY,

(VII) THE PRESENCE OR ABSENCE OF HAZARDOUS MATERIALS ON, IN, UNDER, ABOVE OR ABOUT THE PROPERTY OR ANY ADJOINING OR NEIGHBORING PROPERTY,

(VIII) THE QUALITY OF ANY LABOR AND MATERIALS USED IN ANY IMPROVEMENTS,

(IX) THE ECONOMICS OF, OR THE INCOME AND EXPENSES, REVENUE OR EXPENSE PROJECTIONS OR OTHER FINANCIAL MATTERS, RELATING TO, THE OPERATION OF THE PROPERTY, OR

(X)   THE LEASES, CONTRACTS OR ANY OTHER AGREEMENTS AFFECTING THE PROPERTY.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER EXPRESSLY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT OR IN THE CLOSING DOCUMENTS, BUYER IS NOT RELYING ON ANY REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS OF SELLER ANY OTHER SELLER PARTY, OR ANY OTHER AGENT OR BROKER OF SELLER, WHETHER IMPLIED, PRESUMED OR EXPRESSLY PROVIDED AT LAW OR OTHERWISE, OR ARISING BY VIRTUE OF ANY STATUTE, COMMON LAW OR OTHER RIGHT OR REMEDY IN FAVOR OF BUYER. BUYER FURTHER

ACKNOWLEDGES AND AGREES THAT SELLER IS UNDER NO DUTY TO MAKE ANY INQUIRY REGARDING ANY MATTER THAT MAY OR MAY NOT BE KNOWN TO SELLER, ANY OTHER SELLER PARTY, OR ANY OTHER AGENT OR BROKER OF SELLER.  THIS <u>SECTION 3.4</u> SHALL SURVIVE THE CLOSING OR, IF THE CLOSING DOES NOT OCCUR, THE TERMINATION OF THIS AGREEMENT.

ANY REPORTS, REPAIRS OR WORK REQUIRED BY BUYER ARE THE SOLE RESPONSIBILITY OF BUYER, AND BUYER AGREES THAT THERE IS NO OBLIGATION ON THE PART OF SELLER TO MAKE ANY CHANGES, ALTERATIONS OR REPAIRS TO THE PROPERTY OR TO CURE ANY VIOLATIONS OF LAW OR TO COMPLY WITH THE REQUIREMENTS OF ANY INSURER OR REGULATION.  BUYER IS SOLELY RESPONSIBLE FOR OBTAINING ANY CERTIFICATE OF OCCUPANCY OR ANY OTHER APPROVAL OR PERMIT NECESSARY FOR TRANSFER OR OCCUPANCY OF THE PROPERTY AND FOR ANY REPAIRS OR ALTERATIONS NECESSARY TO OBTAIN THE SAME, ALL AT BUYER'S SOLE COST AND EXPENSE; PROVIDED, HOWEVER, THAT THE FAILURE OF BUYER TO OBTAIN ANY SUCH CERTIFICATE OR OTHER APPROVAL SHALL NOT AFFECT BUYER'S OBLIGATION TO PURCHASE THE PROPERTY.

## ARTICLE IV
## TITLE AND SURVEY MATTERS

**Section 4.1.  Delivery; Objections**.

(a)     Within twenty (20) days after the Effective Date, Buyer at Buyer's expense shall obtain an ALTA survey (the "**Survey**") of the Property performed by a State of Texas registered surveyor, certified to Buyer, Seller and the Title Company and any other party required by Buyer.  Buyer shall cause a copy of any such Survey to be delivered to Seller and Escrow Agent promptly after Buyer's receipt thereof.

(b)     Within five (5) days after the Effective Date, Seller shall obtain a title insurance commitment or preliminary title report with a copy of all items listed on Schedule B and recorded of record (a "**Title Commitment**") issued by Escrow Agent (also referred to herein as the "**Title Company**") showing title for the Property. For purposes of the Title Commitment, the following shall constitute "**Permitted Exceptions**":

(i)     Rights of Tenants, as tenants only, under Leases and New Leases;

(ii)     Liens for Real Estate Taxes for the current and subsequent years, not yet due and payable, including special assessments and special improvement district or local improvement district bonds;

(iii)     All instruments of record not objected to by Buyer pursuant to <u>Section 4.1(c)</u>, except for Mandatory Cure Items;

(iv)     Any state of facts that a reasonable physical inspection of the Property would reveal;

(v)     Matters disclosed by the Survey not objected to by Buyer pursuant to <u>Section 4.1(c)</u>;

(vi)    Any exceptions caused by Buyer or any other Buyer Party;

(vii)   To the extent not objected to by Buyer, all present and future zoning, building and other applicable governmental laws, ordinances, codes, restrictions and regulations of the municipality in which the Property is located and all other governmental authorities having jurisdiction, in each case in respect of the Property; and

(viii)  Any other matters affecting title to the Property that are approved or waived by Buyer pursuant to the terms hereof.

(c)     If (i) any exceptions appear on the Title Commitment, other than the Permitted Exceptions, which are not acceptable to Buyer, or (ii) any encroachments, overlapping of improvements or other conditions are shown on the Survey that are not acceptable to Buyer and would cause the Title Company to list such as an exception on the Title Policy, Buyer shall notify Seller ("**Title Objection Notice**") of such unacceptable matters ("**Title Objection Matters**") not later than three (3) days after the Survey Delivery Date.

(d)     Seller may elect (but shall not be obligated) to remove or cause to be removed any such Title Objection Matters and Seller may notify Buyer in writing within three (3) days after receipt of Buyer's notice of Title Objection Matters (but, in any event, prior to the end of the Due Diligence Period) whether Seller elects to remove the same. Failure of Seller to respond in writing within such period shall be deemed an election by Seller not to remove such Title Objection Matters. If Seller elects not to remove one or more Title Objection Matters (or is deemed to have so elected), then, within three (3) days after such election (but, in any event, prior to the end of the Due Diligence Period), Buyer shall elect to either (i) terminate this Agreement, in which event the Earnest Money (less the Independent Consideration) shall be paid to Buyer and, thereafter, the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Agreement, or (ii) waive such Title Objection Matters and proceed to Closing. Failure of Buyer to respond in writing within such period shall be deemed an election by Buyer to waive such Title Objection Matters and proceed to Closing.  Any such Title Objection Matter so waived (or deemed waived) by Buyer shall be deemed to constitute a Permitted Exception and the Closing shall occur as herein provided without any reduction of or credit against the Purchase Price.

(e)     The foregoing procedures for making and responding to Title Objection Matters shall also apply with respect to any title exceptions (other than Permitted Exceptions) which first appear on update of the Title Commitment received by Buyer after the date of the Title Objection Notice (and Buyer shall promptly provide Seller with copies of any updated Title Commitments and Schedule B items first shown in such updated commitments), except that <u>all</u> such objections must be made on or before the earlier of five (5) days after Buyer becomes aware of such Title Objection Matters or the

end of the Due Diligence Period, and all agreements to cure and termination rights relating thereto must be made or exercised, as applicable, on or before the earlier of the time periods provided in the previous paragraph (excluding the expiration of the Due Diligence Period cutoff if the Due Diligence Period has already expired) or Closing (subject to Seller's right to adjourn the Closing as provided below). Unless Buyer is entitled to and timely objects to such title matters, all such title matters disclosed by the Title Commitment or any update thereof shall be deemed to constitute additional Permitted Exceptions.

(f)     Except with respect to Mandatory Cure Items, nothing contained herein shall require Seller to bring any action or proceeding or otherwise to incur any expense to correct, discharge or otherwise remove any Title Objection Matter, title exceptions or defects with respect to the Property or to remove, remedy or comply with any other grounds for Buyer's refusing to approve title, provided that if on the Closing Date there are any Title Objection Matters which Seller has agreed to remove, Seller may use any portion of the Purchase Price being paid at Closing to satisfy same, provided the Title Company shall thereupon delete such lien, encumbrance or Title Objection Matter as an exception to title. Notwithstanding anything herein to the contrary, Seller shall be obligated to eliminate at or prior to Closing any mortgages or other monetary liens or encumbrances placed on the Property unless the same were caused by the acts or omissions of Buyer (collectively, the "**Mandatory Cure Items**") without the need for Buyer's inclusion of such items in the letter to Seller detailing the Title Objection Matters.

(g)     Seller shall be entitled to a reasonable adjournment of the Closing (not to exceed twenty (20) days) for the purpose of the removal of any Title Objection Matters which Seller elects to remove. With respect to Buyer's initial Title Objection Notice and any other objection received by Seller at least eight (8) Business Days prior to the end of the Due Diligence Period, Seller shall notify Buyer, in writing, on or before the date which is three (3) Business Days prior to the scheduled Closing Date, of its election to so adjourn the Closing. With respect to Title Objection Matters received by Seller after the date which is eight (8) Business Days prior to the end of the Due Diligence Period, Seller shall notify Buyer, in writing, at any time prior to the scheduled Closing Date, of its election to adjourn the Closing. For purposes of this <u>Section 4.1</u>, the term "remove" with respect to any Title Objection Matter shall mean that Seller cause the Title Company to remove or, to Buyer's commercially reasonable satisfaction and prior approval, affirmatively insure over the same as an exception to Buyer's title insurance policy, without any additional cost to Buyer, whether such removal or insurance is made available in consideration of payment or by alternative manner reasonably satisfactory to the title insurer.

(h)     Buyer's obligation to purchase the Property is conditioned upon the Title Company having issued or having committed to issue, upon payment of the applicable premium therefor and satisfaction by the parties of the customary conditions thereto, an owner's policy of title insurance in the amount of the Purchase Price in the form of the Title Commitment delivered to and approved by Buyer pursuant to the terms of this <u>Section 4.1</u>.

**Section 4.2. No New Exceptions**.  From and after the date hereof, Seller shall not execute any deed, easement, restriction, covenant or other matter that will encumber title to the Real Property following Closing unless Buyer has received a copy thereof and has approved the same in writing. Buyer, in its sole and absolute discretion, shall be entitled to grant or withhold its consent with respect to any such instrument that is proposed. If Buyer fails to grant consent or object to such proposed instrument within five (5) Business Days after receipt of the aforementioned notice, Buyer shall be deemed to have consented to the proposed instrument.

**Section 4.3. Evidence of Title**.  Delivery of title in accordance with the foregoing shall be evidenced by the Title Company issuing, or to committing to issue, at Closing, upon payment of the applicable premium therefor and satisfaction by the parties of the customary conditions thereto, an ALTA extended coverage Owner's Policy of Title Insurance in the amount of the Purchase Price showing title to the Real Property vested in Buyer or its Permitted Assignee or designee, subject to no Title Objection Matter other than those which are Permitted Exceptions (collectively, the "**Title Policy**").

## ARTICLE V
## INTERIM OPERATION OF THE PROPERTY

**Section 5.1.  Interim Operation of the Property**.

(a)  Except as otherwise contemplated or permitted by this Agreement or approved by Buyer in writing, from the Effective Date to the Closing Date, Seller agrees that it will carry on the business of Seller with respect to the Property in substantially the same the manner in which it has heretofore conducted such business.

(b)  From the Effective Date to the Closing Date, Seller shall first obtain Buyer's approval prior to entering into any new Contract or Lease, or amending or terminating any existing Contract (other than Contracts not being assumed by Buyer) or Lease or materially altering the Property. Any such approval by Buyer shall not be unreasonably withheld or delayed and shall be deemed granted if Buyer does not respond in writing to Seller's request for approval within three (3) Business Days from its receipt thereof; provided, however, from and after the expiration of the Due Diligence Period Buyer's approval of any new Contract or Lease, or amendment or termination of an existing Contract or Lease shall be in Buyer's sole and absolute discretion.

**Section 5.2.  Leasing Costs**.

(a)  Subject to <u>Section 5.2(c)</u> below, at or prior to Closing, Seller shall either pay or provide Buyer a credit against the Purchase Price in an amount equal to all third party leasing commissions which are or become payable prior to Closing with respect to the Existing Leases.

(b)  Subject to <u>Section 5.2(c)</u> below, in the event that there are any unpaid costs for tenant improvement work or unpaid tenant improvement allowances with respect to any Lease as of the Closing Date (if any), then at Closing Buyer shall receive a credit towards the Purchase Price for any such unpaid amounts, and Seller shall have no further responsibility for such costs or allowances.

(c)     Notwithstanding anything to the contrary provided in <u>Section 5.2(a)</u> and <u>(b)</u> above, if the Closing occurs, Buyer shall be responsible and shall pay for any Leasing Costs relating to or arising from (i) those Leases or modifications of Leases entered into by Buyer on or after the Closing Date, (ii) any Leases entered into by Seller after the Effective Date and prior to the Closing Date which have been approved by Buyer, and (iii) the exercise by a Tenant of a renewal, expansion or extension option contained in any Lease on or after the Effective Date, and Buyer shall reimburse Seller at Closing for all such costs incurred by Seller prior to Closing.  Pursuant to the Assignment of Leases to be executed by Buyer and Seller at Closing, Buyer shall assume any then outstanding obligations for Leasing Costs for which Buyer is responsible hereinafter.

(d)     The provisions of this <u>Section 5.2</u> shall survive the Closing.

**Section 5.3.  Seller's Maintenance of the Property**.  Between the Effective Date and the Closing Date, Seller shall (a) maintain (or, as applicable, use reasonable efforts to cause the Tenants to maintain) the Property in substantially the same manner as prior hereto pursuant to Seller's normal course of business, subject to reasonable wear and tear and further subject to the occurrence of any damage or destruction thereto by casualty or other causes or events beyond the reasonable control of Seller; provided, however, that Seller's maintenance obligations under this <u>Section 5.3</u> shall not include any obligation to make unbudgeted capital expenditures not incurred in Seller's normal course of business or any other unbudgeted expenditures not incurred in Seller's normal course of business; (b) continue to maintain Seller's existing insurance coverage; and (c) not grant any voluntary liens or encumbrances that will continue to affect the Property following Closing other than pursuant to <u>Section 4.2</u>.

**Section 5.4.  Lease Enforcement.**  Subject to the provisions of <u>Section 5.1</u>, prior to the Closing Date, Seller shall have the right, but not the obligation, to enforce the rights and remedies of the landlord under any Lease or New Lease, by summary proceedings or otherwise, and to apply all or any portion of any security deposits then held by Seller toward any loss or damage incurred by Seller by reason of any defaults by such Tenant. Seller will provide to Buyer copies of any written notices of default under a Lease delivered by or to any Tenant after the Effective Date promptly following Seller's receipt from or delivery to a Tenant.

**Section 5.5.  Tenant Notices**.  At the Closing, Seller will furnish Buyer with a signed notice in the form attached hereto as Exhibit F, and Buyer shall countersign and deliver such tenant notice to the Tenants after Closing.

**Section 5.6.  Risk of Loss and Insurance Proceeds**.  Unless the Property is deemed "materially damaged or destroyed" as provided below, Buyer will be bound to purchase the Property for the full Purchase Price as required by the terms hereof without regard to the occurrence or effect of any damage to the Property or destruction of any improvements thereon, provided that upon the Closing, there shall be a credit against the Purchase Price due hereunder equal to the sum of (a) the amount of any insurance proceeds or awards collected by Seller for the repair or restoration of such damage or destruction less any sums reasonably expended by Seller prior to the Closing for the restoration or repair of the Property (the "**Insurance Proceeds Credit Amount**"), plus (b) the amount of any insurance deductible or self-insured retention amount withheld from the insurance awarded for the repair or restoration of such damage or

destruction (the "**Deductible Credit Amount**"), plus (c) the cost to repair such damage or destruction to the extent not otherwise covered by the amount of insurance proceeds or awards credited to Buyer under item (a) above.  To the extent the proceeds or awards have not been collected as of the Closing, then such proceeds or awards shall be assigned to Buyer, except to the extent needed to reimburse Seller for sums reasonably expended prior to the Closing for the restoration or repair of the Property.  For purposes hereof, the Property shall be deemed "materially damaged or destroyed" if the estimated repair cost is greater than two and one-half percent (2.5%) of the Purchase Price.  If the Property is materially damaged or destroyed by fire or other casualty, Buyer may terminate this Agreement on written notice to Seller given within ten (10) Business Days after receiving notice of the occurrence of such fire or casualty. If Buyer elects to terminate this Agreement, then the Earnest Money (less the Independent Consideration) shall be returned to Buyer and neither party shall have any further rights or obligations hereunder except for the Obligations Surviving Termination. If Buyer elects to proceed with the purchase, then upon the Closing, Buyer shall be entitled to a credit against the Purchase Price in the sum of the Insurance Proceeds Credit Amount plus the Deductible Credit Amount and shall receive an assignment of any uncollected and unexpended proceeds or awards, all as set forth in this Section 5.6.  The provisions of this Section 5.6 shall survive the Closing.

      **Section 5.7.  Condemnation and Eminent Domain**.  If any condemnation proceedings are instituted, or notice of intent to condemn is given, with respect to all or any portion of the Real Property, Seller shall promptly upon obtaining knowledge thereof notify Buyer thereof (a "**Taking Notice**"). If the condemnation will not result in a material and adverse effect (as hereinafter defined) on the Property, the parties shall proceed to Closing, in which event Seller shall assign or pay to Buyer at Closing all of Seller's right, title, and interest in any award payable on account of the condemnation and/or pay to Buyer all such awards previously paid, less any sums reasonably expended by Seller prior to the Closing for the restoration or repair of the Property (excluding consultant and attorney fees). In the event that such condemnation will result in a material and adverse effect on the Property, Buyer shall have the option, which shall be exercised by written notice to Seller and Escrow Agent within ten (10) Business Days after its receipt of the Taking Notice, either (i) to terminate this Agreement and receive the return of the Earnest Money (less the Independent Consideration), in which case the parties shall have no further rights or obligations under this Agreement (except for the Obligations Surviving Termination), or (ii) to consummate the purchase of the Property without a reduction of the Purchase Price, in which event Seller shall assign or pay to Buyer at Closing all of Seller's right, title, and interest in any award payable on account of the condemnation proceeding and/or pay to Buyer all such awards previously paid, less any sums reasonably expended by Seller prior to the Closing for the restoration or repair of the Property (excluding consultant and attorney fees).  For the purposes of this Section 5.7, "material and adverse effect" means (w) any permanent reduction in the amount of any of the rentable square footage of the Improvements, (x) the permanent, material disruption of access to the Property, or (y) that the condemnation proceeds are not reasonably sufficient to rebuild or restore the Improvements to substantially the condition in which the Improvements existed prior to the taking. Failure of Buyer to give notice of Buyer's election within such ten (10) Business Day period shall be deemed an election by Buyer to consummate the purchase per subsection (ii) above.

      **Section 5.8.  Contracts**.  At Closing, Buyer shall assume all Contracts relating to the Property.

**Section 5.9. Notifications**.  Between the Effective Date and the Closing, Seller shall promptly notify Buyer of the institution of any condemnation, environmental, zoning or other land-use regulation proceedings relating to the Property of which Seller receives written notice during such period, any written notices of violations of any legal requirements relating to the Property received by Seller during such period from any Governmental Authority, and any litigation against Seller that arises during such period out of the ownership or operation of the Property.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

**Section 6.1. Representations and Warranties of Seller**.  Subject to the provisions of Sections 6.2 and 6.3, Seller hereby makes the following representations and warranties:

(a)     Seller is not a "foreign person" as defined in Section 1445 of the Code and any related regulations.

(b)     Seller is duly organized and validly existing and in good standing under the laws of its state of formation and is duly qualified to transact business in the State of Texas and the execution, delivery and performance of this Agreement and all other documents to be executed and delivered by Seller pursuant to this Agreement are within the organizational power of Seller and have been or will prior to Closing be duly authorized.

(c)     A copy of each Existing Lease has been furnished by Seller to Buyer and the copies so provided are true and complete in all material respects. The Leases have not been amended, modified or terminated (except as may be disclosed to Buyer in the Tenant Estoppel Certificates).

(d)     Except as disclosed in the Seller Deliveries, there are no leasing commissions or unpaid tenant improvement costs or allowances payable by Seller with regard to any of the Existing Leases.

(e)     Except as may be set forth in the Existing Leases or any document recorded against the Property, Seller has not granted any option or right of first refusal or first opportunity to any party to acquire any fee interest in any portion of the Property.

(f)     A true and correct copy of all leasing commission agreements, if any, relating to the Property are set forth on Schedule 6.1(f).

(g)     To Seller's knowledge, Seller is not in default under any of the Contracts to be assumed by Buyer under this Agreement and Seller is current with respect to amounts payable for work performed or services provided under such Contracts in accordance with the terms of such Contracts.

(h)     Seller has not collected any funds from Tenants related to a sinking fund and/or reserve for future capital improvements associated with the Property.

17

For purposes of this Agreement and any document delivered at Closing, whenever the phrases "to the best of Seller's knowledge", or the "knowledge" of Seller or words of similar import are used, they shall be deemed to refer to the current, actual, conscious knowledge only, and not any implied, imputed or constructive knowledge, without any independent investigation having been made or any implied duty to investigate, of Rob Bradley, the Seller's Director of Real Estate - Southeast. Such individual shall have no personal liability under this Agreement or otherwise with respect to the Property.

Each of the representations and warranties of Seller contained in this Section 6.1: (i) is made on the Effective Date; and (ii) shall be deemed remade by Seller, and shall be true in all material respects, as of the Closing Date.

**Section 6.2.  Changes in Seller Representations/Waiver**. Notwithstanding anything to the contrary contained herein, Buyer acknowledges that Buyer shall not be entitled to rely on any representation made by Seller in this Agreement to the extent, prior to or at Closing, Buyer shall have or obtain knowledge of any information that is contradictory to such representation or warranty; provided, however, if Buyer determines prior to Closing that there is a material breach of any of the representations and warranties made by Seller in this Agreement, then Buyer shall, at its option, by sending to Seller written notice of its election either (i) terminate this Agreement or (ii) waive such breach and proceed to Closing with no adjustment in the Purchase Price and Sellers shall have no further liability as to such matter thereafter. In the event Buyer terminates this Agreement for the reasons set forth above, the Earnest Money (less the Independent Consideration) shall be refunded to Buyer and neither Buyer nor Seller shall thereafter have any other rights or remedies hereunder other than the Obligations Surviving Termination. In furtherance thereof, Buyer agrees that Seller shall have no liability with respect to any of the foregoing representations and warranties or any representations and warranties made in any other document executed and delivered by Seller to Buyer to the extent that, prior to the Closing, Buyer discovers or learns of information (from whatever source, including without limitation any property manager, any estoppel certificate, as a result of Buyer's due diligence tests, investigations and inspections of the Property, or from disclosure by Seller or Seller's Parties) that contradicts any such representations and warranties, or renders any such representations and warranties untrue or incorrect, and Buyer nevertheless consummates the transaction contemplated by this Agreement.

**Section 6.3.  Survival of Seller Representations and Warranties**. Except as otherwise specifically set forth in this Agreement, the representations and warranties of Seller contained herein or in any Closing Document shall survive only until the date that is eighteen (18) months following the Closing Date (the "**Expiration Date**"). Any Claims that Buyer may have at any time against Seller for a breach of any such representation or warranty, whether known or unknown, with respect to which a Claim Notice has not been delivered to Seller on or prior to the Expiration Date shall not be valid or effective. For the avoidance of doubt, on the Expiration Date, Seller shall be fully discharged and released (without the need for separate releases or other documentation) from any liability or obligation to Buyer and any other Buyer Party and/or their successors and assigns with respect to any Claims or any other matter relating to this Agreement, any Closing Document or the Property, except solely for those matters that are then the subject of a pending Claim Notice timely delivered by Buyer to Seller. Any Claims that Buyer may have at any time against Seller for a breach of any such representation or warranty, whether known or

18

unknown, with respect to which a Claim Notice has been delivered to Seller on or prior to the Expiration Date may be the subject of subsequent litigation brought by Buyer against Seller, but only if such litigation is commenced against Seller on or prior to the date that is ninety (90) days following the Expiration Date (the "**Claim Bar Date**"). For the avoidance of doubt, on the Claim Bar Date, Seller shall be fully discharged and released (without the need for separate releases or other documentation) from any liability or obligation to Buyer and/or its successors and assigns with respect to any Claims or any other matter relating to this Agreement, any Closing Document or the Property, except solely for those matters that are the subject of litigation by Buyer against Seller that is pending on the Claim Bar Date. Buyer is represented by counsel, and Buyer acknowledges and agrees that the ninety (90) day period establishing the Claim Bar Date is shorter than the time period set forth in Tex. Civ. Prac. & Rem. Code Ann. § 16.070 (Vernon 2012). To the fullest extent permitted by law, Buyer relinquishes its rights under Section 16.070. In the event the ninety (90) day time period establishing the Claim Bar Date is held invalid or unenforceable by a court of competent jurisdiction, the Parties agree that: (i) the Claim Bar Date shall instead be the date that is two (2) years and one (1) day after the Closing Date; and (ii) such holding shall not affect any other covenants, agreements, conditions, provisions or terms of this Section or this Agreement. All of the foregoing limitations shall survive Closing.

      **Section 6.4. Representations and Warranties of Buyer**. Buyer hereby makes the following representations and warranties:

      (a)    Buyer is a limited partnership duly organized and validly existing under the laws of the State of Texas. Buyer further represents and warrants to Seller that this Agreement and all documents executed by Buyer that are to be delivered to Seller at Closing (i) are, or at the time of Closing will be, duly authorized, executed and delivered by Buyer, (ii) do not, and at the time of Closing will not, violate any provision of any agreement or order to which Buyer is a party, and (iii) constitutes (or in the case of Closing Documents will constitute) a valid and legally binding obligation of Buyer, enforceable in accordance with its terms.

      (b)    Buyer has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing, of any involuntary petition by Buyer's creditors, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of Buyer's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Buyer's assets, (v) admitted in writing its inability to pay its debts as they come due or (vi) made an offer of settlement, extension or composition to its creditors generally. As of the Closing Date, Buyer will have sufficient funds to pay the Purchase Price and consummate the transactions contemplated by this Agreement.

      (c)    Buyer (i) is a sophisticated investor, (ii) is represented by competent counsel and (iii) understands the assumptions of risk and liability set forth in this Agreement.

      (d)    (i) Buyer is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September

24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and is not engaging in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of, any such person, group, entity or nation; (ii) Buyer is not engaging in this transaction, directly or indirectly, in violation of any laws relating to drug trafficking, money laundering or predicate crimes to money laundering; and (iii) none of the funds of Buyer have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity in Buyer or the Property is prohibited by law or that the transaction or this Agreement is or will be in violation of law;

Each of the representations and warranties of Buyer contained in this <u>Section 6.4</u>: (i) is made on the Effective Date; (ii) shall be deemed remade by Buyer and/or its assignee(s), as applicable and appropriate, and shall be true in all material respects, as of the Closing Date; and (iii) shall survive Closing.

**Section 6.5. Brokers**. Seller shall be solely responsible for the payment of any real estate commission or finders' fee owed to its agent, CBRE, Inc. (2.0% of Sales Price) and to Buyer's Agent, together Mark Lehman and Eric Hughes (2.0% of Sales Price). Buyer represents and warrants that it was only represented by Mark Lehman and Eric Hughes in this transaction and that there are no claims or rights for brokerage commissions or finders' fees in connection with the transactions contemplated hereby by any other person or entity other than CBRE, Inc., Mark Lehman and Eric Hughes. If any other person brings a claim for a commission or finder's fee based upon any contact, dealings or communication with Buyer or Seller, then the party through whom such person makes its claim shall defend the other party (the "**Indemnified Party**") from such claim, and shall indemnify the Indemnified Party and hold the Indemnified Party harmless from any and all costs, damages, claims, liabilities or expenses (including without limitation, reasonable attorneys' fees and disbursements) incurred by the Indemnified Party in defending against the claim. The provisions of this <u>Section 6.5</u> shall survive the Closing or, if the Closing does not occur, any termination of this Agreement.

## ARTICLE VII
## CLOSING, DELIVERIES AND PRORATIONS

**Section 7.1. Closing**. The Closing hereunder shall be held and delivery of all items to be made at the Closing under the terms of this Agreement shall be held via an escrow closing fifteen (15) days following the expiration of the Due Diligence Period (the "**Closing Date**"), with time being of the essence; provided, however, that Seller may extend the Closing Date by up to sixty (60) days to provide Seller with additional time to obtain the Bankruptcy Court Approvals (defined below) as required under Section 7.7 hereof by providing Buyer with written notice prior to the then-applicable Closing Date.

**Section 7.2. Estoppel Certificates**. As a condition to Buyer's obligation to perform under this Agreement and purchase the Property, Seller shall obtain and provide to Buyer as soon

as reasonably practicable after the receipt thereof but no later than five (5) Business Days prior to the Closing Date, tenant estoppel certificates from Tenants, dated no earlier than thirty (30) days prior to the Closing Date. Such estoppel certificates shall be in substantially the form attached hereto as Exhibit E; provided, however, if a form of estoppel certificate is attached to or otherwise prescribed in a particular lease document, that form shall be deemed to be acceptable to Buyer. If the Tenant estoppel certificates are inconsistent with the representations and warranties made by Seller pursuant to Section 6.1 above in any material adverse respect or inconsistent in any material adverse respect regarding the financial obligations of the landlord under the Leases, or if the Tenant estoppel certificates indicate that Seller is in a material default under the Leases (or would be in a material default under the Leases, with the giving of notice or passage of time, or both), Seller shall use its good faith efforts (without any obligation to institute any legal or administrative proceedings or to expend any funds) to resolve such inconsistency or cure such default in accordance with the Leases. Any qualification of any assertion in the Tenant estoppel certificates regarding the status or the performance of any of landlord's obligations under the lease that such assertion is made "to Tenant's knowledge" or similar qualification made by a Tenant shall be acceptable. If Seller fails to so obtain and deliver the required Tenant estoppel certificates from the Tenants on or before a date at least five (5) days prior to the Closing, or fails to resolve any such inconsistency or to cure any such default on or before the Closing Date, Buyer may, by written notice to Seller, elect either (i) to purchase the Property anyway, in accordance with the provisions hereof, without any reduction in or abatement of the Purchase Price, notwithstanding said failure, and without any continuing obligation upon Seller to obtain, resolve cure or perform the same, or (ii) to terminate this Agreement by written notice to Seller and thereafter shall have no obligation to proceed with the Closing, the Earnest Money (less the Independent Consideration) shall be returned to Buyer and neither party shall have any further obligation hereunder except those Obligations Surviving Termination. All Buyer objections to Tenant estoppel certificates must be in writing. If Buyer fails to so elect either said option (i) or said option (ii), Buyer shall be deemed to have elected said option (i). If, prior to the expiration of the Due Diligence Period, Buyer provides Seller with subordination, nondisturbance and attornment agreements ("**SNDAs**") for one or more Tenants, Seller shall deliver the SNDAs to the Tenants and use commercially reasonable effort (without being required to make any payment or institute any legal proceeding) to obtain executed SNDAs prior to Closing; provided, however, delivery of executed SNDAs shall not be a condition to Buyer's obligation to close. In the event any of the foregoing conditions are not satisfied prior to or at the Closing, Buyer may terminate this Agreement by written notice to Seller and thereafter shall have no obligation to proceed with the Closing, neither party shall have any further obligation hereunder except those Obligations Surviving Termination. Notwithstanding the foregoing, nothing contained in this Section 7.2 shall waive or diminish any right or remedy Buyer may have for Seller's default or breach of this Agreement.

**Section 7.3. Deposit of Documents**.

      (a)    At or before the Closing, Seller shall deposit into escrow the following items:

          (i)    a duly executed and acknowledged Special Warranty Deed in the form attached hereto as Exhibit A (the "**Deed**") for the Property;

(ii)     a duly executed counterpart of an Assignment and Assumption of Leases in the form attached hereto as Exhibit C (the "**Assignment of Leases**") for the Property;

(iii)    a duly executed counterpart of an Assignment and Assumption of Contracts, Warranties, Guaranties, Permits and Licenses in the form attached hereto as Exhibit D (the "**Assignment of Contracts**") for the Property;

(iv)     a certified rent roll required under Section 6.1(d) of this Agreement;

(v)      a duly executed counterpart of such disclosures and reports (including withholding certificates) as are required of Seller by applicable state and local law in connection with the conveyance of the Property;

(vi)     Seller's affidavits or comparable assurance to the Title Company regarding work performed and other customary matters, in a form reasonably acceptable to Seller and the Title Company;

(vii)    an affidavit pursuant to Section 1445(b)(2) of the Code, and on which Buyer is entitled to rely, that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code;

(viii)   the tenant notice letters as required by Section 5.6 of this Agreement; and

(ix)     such other documents as may be specifically required under this Agreement, and such other customary documents as shall be necessary and appropriate to effect the Closing.

(b)      At or before Closing, Buyer shall deposit into escrow the following items:

(i)      the Purchase Price less the amount of the Earnest Money;

(ii)     a duly executed counterpart of the Assignment of Leases for the Property;

(iii)    a duly executed counterpart of the Assignment of Contracts for the Property;

(iv)     a duly executed counterpart of such disclosures and reports as are required of Buyer by applicable state and local law in connection with the conveyance of the Property; and

(v)      such other documents as may be specifically required under this Agreement, and such other customary documents as shall be necessary and appropriate to effect the Closing.

(c)     If not previously provided to Buyer, Seller shall deliver to Buyer originals of the Leases (if originals are in Seller's possession or control) promptly following the Closing Date.

(d)     The form documents attached as exhibits to this Agreement are deemed acceptable to Buyer and Seller. Buyer and Seller shall each deposit such other instruments as are reasonably required by the Title Company or otherwise required to close the escrow and consummate the purchase and sale of the Property in accordance with the terms hereof; provided, that Seller shall not be required to provide any indemnities or affidavits or to escrow any funds other than as expressly set forth herein.

(e)     The acceptance by Buyer of the Deed at Closing shall be deemed to be a full performance and discharge of every obligation on the part of Seller to be performed under this Agreement, other than those that are specifically stated in this Agreement to survive the Closing.

**Section 7.4.  Prorations**.  The following shall be adjusted between Seller and Buyer and shall be prorated as of 12:01 A.M. local time on the Closing Date as if Buyer was the owner of the Property for the entire Closing Date:

(a)     Base rents (and, subject to subsection 7.4(d) below, reimbursements for operating expenses, insurance, and Real Estate Taxes) payable under the Existing Leases and New Leases (collectively, the "**Rents**") for the month of Closing shall be prorated as of the Closing Date, except that no proration shall be made for Rents which are due as of the Closing Date but which have not been paid by Tenants as of the Closing Date (hereinafter called the "**Delinquent Rents**"). Any Delinquent Rents collected after the Closing shall be applied as follows: (i) first, to the calendar month for which the payment is made; (ii) second, to post-Closing delinquencies owed to Buyer; (iii) third, to Buyer's costs of collecting post-Closing delinquencies, and (iv) fourth, to pre-Closing delinquencies owed to Seller. For a period of one hundred twenty (120) days after the Closing, Buyer shall use reasonable efforts to collect any Delinquent Rents that accrued prior to the Closing Date (but Seller shall have the right to pursue all remedies against any Tenant to collect Delinquent Rents, provided that Seller may not seek as a remedy in any litigation against a Tenant the termination of any Lease or the dispossession of any Tenant). Seller and Buyer each agree to forward any Rents received by it after the Closing Date to the other, if and as applicable hereunder, for application in accordance with the provisions hereof.

(b)     Real Estate Taxes due and payable in the calendar year of Closing relating to the Property shall be prorated as of the Closing Date except for that portion of Real Estate Taxes which are reimbursable by Tenants on an annual or semi-annual basis for which Tenant has not been invoiced. For any semi-annual basis Tenant reimbursement, the first semi-annual reimbursement, provided that the period to which such first semi-annual reimbursement pertains ends prior to the Closing Date, shall be deemed invoiced, whether such invoice has been issued or not. The apportionment of taxes shall be made on the basis of the tax rate for the latest assessed valuation of the Property and shall be final.

(c)    All items of expense for the Property, including but not limited to utility charges, maintenance charges, and charges under the Contracts (but excluding any such charges paid or payable directly by Tenants to parties other than Seller), shall be prorated as of Closing Date. Seller and Buyer shall cooperate to arrange for final utility readings as close to the Closing Date as possible and the issuance of a final bill to Seller with Buyer being designated the billing party in lieu of Seller for all utilities that may be in the name of Seller from and after the Closing Date. Seller shall be entitled to retain any deposits of Seller held by utility companies with respect to the Property.

(d)    Seller shall be entitled to receive and retain all amounts payable by Tenants as estimated payments for Real Estate Taxes, operating expenses and other pass-through items prior to the Closing Date. On or before the Closing Date, Seller shall provide Buyer with an operating expense statement setting forth (i) the actual costs incurred by Seller for Real Estate Taxes, operating expenses and other pass-through items during Seller's period of ownership that are reimbursable to Seller, as landlord, by Tenants under the Leases from January 1, 2020 through the Closing Date (the "**Reimbursable Expenses**"); (ii) the Tenant reimbursements for such amounts payable to Seller by Tenants for calendar year 2020 ("**Actual Tenant Reimbursements**"); and (iii) a reconciliation of the difference between the two (i.e., establishing that the Reimbursable Expenses were either more or less than the Actual Tenant Reimbursements). Buyer shall be responsible for calculating the year-end reconciliations of Tenant reimbursements of such amounts for calendar year 2020 (including proper proration between Seller and Buyer) and shall deliver such calculations to Seller no later than April 1, 2021. Any amount due Seller pursuant to the foregoing calculations (in the event the Actual Tenant Reimbursements are less than the Reimbursable Expenses) or Buyer (in the event the Actual Tenant Reimbursements are more than the Reimbursable Expenses), shall be paid by Buyer to Seller or by Seller to Buyer, on or before May 1, 2021. Buyer shall use good faith, commercially reasonable efforts to collect any additional Tenant reimbursements due from Tenants; provided, however, that Buyer shall not be required to sue any Tenant for such amount or dispossess any Tenant from its premises.

(e)    Seller shall calculate the prorations contemplated by this Section 7.4 for Closing and/or supply the required information to Escrow Agent to allow such calculation by Escrow Agent. The parties shall cooperate in the review and finalization of such prorations for Closing. Buyer and Seller shall each be provided upon request the opportunity to review appropriate supporting financial records of the other or their respective property manager pertaining to the proration statements and the Closing and final reconciliations contemplated above.

(f)    The obligations of Seller and Buyer under this Section 7.4 shall survive for the longer of (i) one (1) year from the Closing Date, or (ii) three (3) months following the final reconciliation payment date set forth in Subsection 7.4(d) above.

**Section 7.5. Security Deposits**.  Seller shall pay to Buyer, as a credit against the Purchase Price, the amount of any cash security actually held by Seller pursuant to the Leases and not yet refunded to tenants or applied pursuant to the Leases. With respect to any security deposits that are held in the form of letters of credit or any form other than cash, Seller shall

24

deliver to Buyer at the Closing the original letters of credit or other applicable documents together with such original transfer and assignment documentation as may be necessary for Buyer to thereafter effect the transfer of each letter of credit or other non-cash security deposit to Buyer, provided that any transfer fees or other costs shall be borne by Buyer.

**Section 7.6.  Closing Costs**.  Seller and Buyer agree to pay closing costs as indicated in this Agreement. At Closing, Seller shall pay (i) the costs of releasing all liens, judgments, and other encumbrances that are required to be released by Seller and of recording such releases, (ii) one-half of the fees and costs due Escrow Agent for its services, (iii) for a standard coverage owner's policy for Buyer, less the cost of any endorsements required by Buyer, (iv) the cost of recording the Deed and any other transfer documents, and (v) all other costs to be paid by Seller under this Agreement. At Closing, Buyer shall pay (i) the fees and costs due Escrow Agent for its services less the amount contributed therefor by Seller pursuant to (ii) of the preceding sentence, (ii) the remainder of the premium for the extended coverage owner's policy for Buyer and for any title endorsements or affirmative coverage requested by Buyer, (iii) the cost of the survey, and (iv) all other costs to be paid by Buyer under this Agreement.  Except as otherwise provided for in this Agreement, Seller and Buyer will each be solely responsible for and bear all of their own respective expenses, including without limitation all expenses of legal counsel, accountants, and other advisors incurred at any time in connection with pursuing or consummating the transaction contemplated herein. Any other closing costs not specifically designated as the responsibility of either party in this Agreement shall be paid by Seller and Buyer according to the usual and customary allocation of the same in the jurisdiction in which the Property is located, including without limitation any state, county or local documentary, franchise or transfer taxes. Buyer and Seller agree that, given the de minimis amount of Personal Property included within the Property, no portion of the Purchase Price is allocable or attributable to such Personal Property.

**Section 7.7.  Bankruptcy Court Approvals.**  Buyer and Seller acknowledge and agree that on August 2, 2020, Seller, along with certain Affiliates of Seller, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United-States Bankruptcy Court for the Southern District of Texas ("**Bankruptcy Court**") under Case No. 20-33900 (the "**Bankruptcy Proceeding**"). Notwithstanding anything to the contrary contained in this Agreement, the Closing of the transactions contemplated hereunder shall be subject in all respects to the Bankruptcy Code, the Bankruptcy Proceeding, and approval by the Bankruptcy Court.  It shall be a condition precedent to Seller's obligations under this Agreement that Seller shall have received all necessary final approvals from the Bankruptcy Court authorizing the transactions contemplated hereunder (the "**Bankruptcy Court Approvals**").  If the Bankruptcy Court Approvals are not obtained by the Closing Date, as may be extended pursuant to Section 7.1 hereof, (i) this Agreement shall be deemed terminated and of no further force and effect, (ii) Seller shall not be deemed to be in default under this Agreement, (iii) the Earnest Money (less the Independent Consideration) shall be returned to Buyer, and (iv) except for obligations which expressly survive termination of this Agreement, neither party shall have any further liability or obligations hereunder.

**ARTICLE VIII**
**DEFAULT; REMEDIES**

**Section 8.1.  Default by Seller**.  If Seller breaches or defaults under this Agreement and fails to cure such breach or default within ten (10) days after receipt of written notice thereof from Buyer (such failure, a "**Seller Default**"), then Buyer shall elect by written notice to Seller and Escrow Agent within three (3) days of such Seller Default, as Buyer's sole remedies against Seller, either to (a) terminate this Agreement and receive a return of the Earnest Money and, except for the Obligations Surviving Termination, neither of the parties shall have any further liability or obligation hereunder, or (b) enforce specific performance against Seller and compel Seller to convey the Property to Buyer as required under this Agreement. Buyer shall be deemed to have elected to terminate this Agreement (as provided in subsection (a) above) if Buyer fails to deliver to Seller written notice of its intent to file a cause of action for specific performance against Seller on or before ninety (90) days after such Seller Default, or having timely given Seller such notice, fails to file a lawsuit asserting such cause of action within one hundred twenty (120) days after such notice.

**Section 8.2.  Default By Buyer**.  If Buyer breaches or defaults under this Agreement and fails to cure such breach or default (a) within three (3) Business Day after receipt of written notice thereof from Seller if such breach or default is a failure to pay or deposit any amount of money required to be paid or deposited by Buyer under this Agreement, or (b) within ten (10) days after receipt of written notice thereof from Seller, if any other breach or default, then Seller, as its sole remedy against Buyer shall be entitled to retain the Earnest Money as Seller's agreed and total liquidated damages. The parties have agreed that Seller's actual damages in the event of Buyer's default would be extremely difficult or impracticable to determine. After negotiation, the parties have agreed that, considering all the circumstances existing on the date of this Agreement, the amount of the Earnest Money is a reasonable estimate of the damages that Seller would incur in such event. By placing its initials below, each party specifically confirms the accuracy of the statements made above and the fact that each party was represented by counsel who explained, at the time this Agreement was made, the consequences of this liquidated damages provision.  Notwithstanding the foregoing, Seller shall have all remedies at law and in equity with respect to any breach or default by Buyer of or with respect to any indemnity or confidentiality obligations of Buyer or any Obligations Surviving Termination.


INITIALS:    SELLER _____             BUYER _____

**Section 8.3.  Limitations on Liability**.

(a)       The provisions of <u>Sections 8.1</u> and <u>8.2</u> hereof provide the parties' sole remedies for any breaches or defaults under this Agreement prior to Closing, but shall not limit any rights or remedies that either party may have after Closing against the other for a breach or default that occurs after Closing with respect to those provisions of this Agreement, or those provisions of the Closing Documents, that are expressly intended to survive Closing.  Notwithstanding anything to the contrary set forth in this Agreement, however, except as may be expressly provided above in <u>Sections 8.1</u> or <u>8.2</u>, in no event

26

shall Seller be liable to Buyer for any consequential, special or punitive damages as a result of any breach of or default under this Agreement or any of the Closing Documents.

(b)     Notwithstanding any provision to the contrary in this Agreement or in any of the Closing Documents, (i) Seller shall have no liability whatsoever with respect to any Claims suffered or incurred by, asserted or assessed against, or imposed upon Buyer or any Buyer Party under or with respect to this Agreement or any Closing Document (including, without limitation, for any breach of any representation, warranty or covenant by Seller), except to the extent (and only to the extent) that the amount of such Claims exceeds Twenty-Five Thousand Dollars ($25,000) (the "**Threshold Amount**"); and (ii) in no event shall the total aggregate liability of Seller and any Seller Parties for any or all Claims with respect to the entirety of the Property and the transactions contemplated by this Agreement exceed the sum of five percent (5%) of the Purchase Price (the "**Maximum Amount**"). Buyer shall not make any Claim or deliver any Claim Notice unless Buyer in good faith believes the Claims would exceed the Threshold Amount provided in this Section 8.3, and Buyer shall not seek or receive for such Claims any remedies or awards which individually or in the aggregate would exceed the Maximum Amount; provided, however, that in no event shall such limitation apply to any claims of Buyer arising out of the fraud or willful misconduct of Seller.

**Section 8.4.  Survival**.  The terms, provisions and limitations of this Article VIII shall survive the Closing or any termination of this Agreement.

## ARTICLE IX
## PUBLICITY; CONFIDENTIALITY

**Section 9.1.  Publicity**.    Except for any limited disclosures which are reasonably necessitated or required by law or regulation (including without limitation regulations of the Securities and Exchange Commission), Buyer shall not issue or cause or permit its Affiliates to issue any press release or public statement (a "**Release**") with respect to the transactions contemplated by this Agreement without the prior consent of Seller, which consent may be withheld in Seller's sole discretion. If Buyer desires to issue a Release, Buyer shall, at least five (5) Business Days prior to the issuance of the same, deliver a copy of the proposed Release to Seller for its review and comment/approval. If no objection or comments are provided by Seller within such period, consent to the Release shall be deemed to have been given. Notwithstanding the foregoing, following Closing, Buyer may issue a general announcement that does not specifically identify (or readily permit the specific identification of) the Property, Seller, or the Purchase Price, acknowledging that a sale or acquisition, as applicable, of a real estate asset of the general type of the Property has occurred by the announcing party. The provisions of this Section 9.1 shall survive the Closing or any earlier termination of this Agreement.

**Section 9.2.  Confidentiality**.

(a)     Buyer shall maintain, and shall cause Buyer's Representatives to maintain, as confidential any and all material obtained about Seller, the Property, this Agreement and the transactions contemplated hereby (including without limitation all information made available to Buyer pursuant to Section 3.1 above, including without limitation the

27

Due Diligence Materials), and shall not disclose such information to any third party. Except as may be required by law, Buyer will not divulge any such information to other persons or entities, including, without limitation, appraisers, real estate brokers, or competitors of Seller. Notwithstanding the foregoing, Buyer shall have the right to disclose information with respect to the Property to its officers, directors, employees, attorneys, accountants, environmental auditors, appraisers, engineers, potential lenders, affiliates, and Permitted Assignees under this Agreement and other consultants to the extent necessary for Buyer to evaluate its acquisition of the Property provided that all such persons are told that such information is confidential and agree to keep such information confidential. The foregoing restrictions shall not apply to information that was in Buyer's possession prior to disclosure by Seller or is generally available to the public (other than as a result of Buyer's wrongful disclosure thereof).

(b)      If this Agreement is terminated prior to Closing, then unless otherwise agreed or directed by Seller, Buyer shall (i) promptly deliver to Seller any written, electronic, digital or other physical manifestation of Confidential Information or destroy and cause each of Buyer's Representatives to destroy each and every copy of any such materials containing such Confidential Information, and promptly confirm such destruction in writing. Notwithstanding the foregoing, to the extent required by Buyer's customary internal policies or other legal requirements applicable to Buyer, Buyer may retain a copy of the Confidential Information solely to satisfy such requirements, provided that Buyer must otherwise strictly maintain the confidentiality thereof.

(c)      It is further understood and agreed that money damages would not be a sufficient remedy for any breach of the confidentiality provisions of this Agreement by Buyer or its Representatives and Seller shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach. The confidentiality covenants and obligations set forth herein shall survive Closing or any earlier termination of this Agreement for a period of six (6) months.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1.  Notices**.  Any notices required or permitted to be given hereunder shall be given in writing and shall be delivered (a) in person, (b) by certified mail, postage prepaid, return receipt requested, (c) by a commercial overnight courier that guarantees next day delivery and provides a receipt, or (d) electronically by attachment to electronic mail to the addresses set out below, and such notices shall be addressed as follows:

| | |
|---|---|
| To Buyer: | McCorvey Real Estate Holdings, Ltd.<br>8610 Wallisville Road<br>Houston, Texas 77029-1314<br>Email:  kristal@mccorvey.com<br>            tony@mccorvey.com |
| with a copy to: | The Williard Law Firm, L.P.<br>1920 N Memorial Way #207<br>Houston, TX 77007<br>Attn:  Steve Williard<br>Email:  steve@williardlaw.com |
| To Seller: | The Men's Wearhouse, Inc.<br>215 South Denton Tap Road<br>Suite 210<br>Coppell, Texas  75019<br>Attn:  Rob Bradley<br>Email:  rob.bradley@tailoredbrands.com |
| with copy to: | The Men's Wearhouse, Inc. (Counsel)<br>6100 Stevenson Boulevard<br>Fremont, California  94538<br>Attn:  Catherine A. Spicer<br>Email:  cathy.spicer@tailoredbrands.com |
| To Escrow Agent: | Charter Title Company<br>1717 West Loop South, 12th Floor<br>Houston, TX 77027<br>Attn:  Cameron Franz<br>Email:  _____ |

or to such other address as either party may from time to time specify in writing to the other party. Any notice shall be effective on (i) the date of delivery if delivered by hand, (ii) on the day of delivery if delivered electronically before 5:00 P.M. in the time zone in which the Land is located, or if after 5:00 P.M., the next Business Day, (iii) one (1) Business Day after deposit with overnight delivery, and (iv) three (3) Business Days after deposited with the post office when sent by certified mail.

**Section 10.2. Entire Agreement**.  This Agreement, together with the Exhibits and Schedules hereto, contains all agreements, representations, warranties and covenants made by Buyer and Seller and constitutes the entire understanding between the parties hereto with respect to the subject matter hereof. All Exhibits to this Agreement are fully incorporated herein as though set forth at length herein. Any correspondence, memoranda, letters of intent, or other agreements between the parties, including, without limitation, any oral or written statements made by the Seller Parties or the Buyer Parties, are not binding on or enforceable against any party, and are superseded and replaced in total by this Agreement together with the Exhibits and Schedules hereto.

**Section 10.3.  Time**.  Time is of the essence in the performance of each of the parties' respective obligations contained herein; provided, however, that if the date of performance or a deadline falls on a day which is not a Business Day, the date for performance or such deadline shall be deemed extended to the next Business Day. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period is to be excluded.

**Section 10.4.  Intentionally Omitted**.

**Section 10.5.  No Merger**.  Obligations which are expressly provided in this Agreement to be performed after the Closing shall not merge with the transfer of title to the Property but shall remain in effect until fulfilled.

**Section 10.6.  Assignment**.  Buyer's rights and obligations hereunder are not assignable, directly or indirectly, without the prior written consent of Seller, which consent may be given or withheld in Seller's sole and absolute discretion; provided, that Buyer may, by written notice delivered to Seller not less than five (5) Business Days prior to the Closing, assign Buyer's rights under this Agreement to any Affiliate of Buyer or any special purpose entity in which Buyer holds an interest (directly or indirectly) and which is formed specifically to acquire the Property which has, or will at Closing have, the ability to fully perform the obligations of Buyer under this Agreement and agrees to assume all obligations of Buyer under this Agreement (a "**Permitted Assignee**").  Nothing contained in the preceding sentence shall be deemed to release, diminish or otherwise affect the obligations of the original Buyer hereunder, including the obligations to pay the Purchase Price at Closing and to indemnify Seller and the other Seller Parties in accordance with the terms hereof, and any conveyance of the Property to a Permitted Assignee shall be subject to all of the terms, provisions, conditions and limitations set forth in this Agreement to the same extent as if such assignee was the original "Buyer" party named herein.  Any attempted assignment in contravention of this Section shall be null and void.  Subject to the limitations described herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

**Section 10.7.  1031 Exchange**.  Each party may structure its (or its respective assignee's) acquisition or sale, as applicable, as part of a like-kind exchange.  Each party shall reasonably cooperate with the other (at no cost or liability to the cooperating party) in effectuating said like-kind exchange under Section 1031 of the U.S. Internal Revenue Code of 1986, including signing such documents as may be reasonably and customarily necessary to accomplish such exchange; provided, however, that (i) the Closing hereunder shall not thereby be delayed, (ii) the exchanging party shall not be released from any liability or obligation under this Agreement, and (iii) the cooperating party shall not incur any additional liability or undertake any additional obligation as a result of any such like-kind exchange. The party employing the like-kind exchange structure shall pay all costs and expenses associated with effectuating such exchange.

**Section 10.8.  Governing Law; Jurisdiction and Venue**.

(a)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS without reference to the conflict of laws or choice of law provisions of any jurisdiction.

(b)     For the purposes of any suit, action or proceeding involving this Agreement, each party hereby expressly submits to the jurisdiction of all federal and state courts sitting in Harris County, Texas and consents that any order, process, notice of motion or other application to or by any such court or a judge thereof may be served within or without such court's jurisdiction by registered mail or by personal service, provided that a reasonable time for appearance is allowed, and each party agrees that such courts shall have jurisdiction over any such suit, action or proceeding commenced by any party.

(c)     Buyer hereby irrevocably waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any federal or state court sitting in Harris County, Texas and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

**Section 10.9.  Uniform Vendor and Purchaser Risk Act Not Applicable**.  It is the express intent of the parties hereto that the provisions of Sections 5.6 and 5.7 of this Agreement govern the rights of the parties in the event of condemnation of or damage to the Property and that the Uniform Vendor and Purchaser Risk Act (Section 5.007 of the Texas Property Code) not apply to this Agreement or the sale of the Property pursuant to this Agreement.

**Section 10.10.  Notice to Buyer Regarding Restrictive Covenants**.  If the Property is located in a municipality that has required any person who sells or conveys restricted property located inside the boundaries of the municipality to first give to the Buyer written notice of the restrictions and notice of the municipality's right to enforce compliance, at Closing Seller and Buyer shall execute, acknowledge and cause to be recorded in the real property records of the county in which the Property is located the notice required by Section 212.155 of the Texas Local Government Code.

**Section 10.11.  Interpretation of Agreement**.  The article, section and other headings of this Agreement are for convenience of reference only and shall not be construed to affect the meaning of any provision contained herein. Where the context so requires, the use of the singular shall include the plural and vice versa and the use of the masculine shall include the feminine and the neuter. The terms and provisions of this Agreement represent the results of negotiations by the parties, each of which has been represented by counsel of its own choosing, and neither of which has acted under any duress or compulsion, whether legal, economic or otherwise. Consequently, the terms and provisions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the parties each hereby waive the application of any rule of law which would otherwise be applicable in connection with the interpretation and construction of this Agreement that ambiguous or conflicting terms or provisions contained in this Agreement shall be interpreted or construed against the party whose attorney prepared the executed Agreement or any earlier draft of the same.

**Section 10.12.  Amendments**.  This Agreement may be amended or modified only by a written instrument signed by both Buyer and Seller.

**Section 10.13.  No Recording**.  Neither this Agreement nor any memorandum or short form thereof may be recorded by Buyer. Any such recording of this Agreement or a memorandum or short form hereof shall constitute a default under this Agreement and Seller may cause the release or removal thereof simply by recording this Agreement provision.

**Section 10.14.  No Third Party Beneficiary**.  Except as may be expressly stated herein, the provisions of this Agreement are not intended to benefit any third parties.

**Section 10.15.  Severability**.  If, in any action to enforce this Agreement, any one or more of the covenants, agreements, conditions, provisions, or terms of this Agreement is, in any respect or to any extent (in whole or in part), held to be invalid, illegal or unenforceable for any reason, all remaining portions thereof which are not so held, and all other covenants, agreements, conditions, provisions, and terms of this Agreement, will not be affected by such holding, but will remain valid and in force to the fullest extent permitted by law.

**Section 10.16.  Drafts not an Offer**.  The submission of a draft of this Agreement by one party to another is not intended by either party to be an offer to enter into a legally binding contract with respect to the purchase and sale of the Property. The parties shall be legally bound with respect to the purchase and sale of the Property pursuant to the terms of this Agreement only if and when Seller and Buyer have duly and fully executed and delivered to each other a counterpart of this Agreement.

**Section 10.17.  Further Assurances**.  Each party shall, whenever and as often as it shall be reasonably requested to do so by the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all such other documents and do any and all other acts as may be necessary to carry out the express intent and purpose of this Agreement.

**Section 10.18.  Counterparts; Signatures**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  Subject only to approval by the Bankruptcy Court, signatures to this Agreement transmitted by email (including ".pdf"), or delivered by other electronic means shall be valid and effective to bind the party so signing. Each party agrees to promptly deliver an execution original to this Agreement with its actual signature to the other party, but a failure to do so shall not affect the enforceability of this Agreement, it being expressly agreed that each party to this Agreement shall be bound by its own electronic signature and shall likewise accept the electronic signature of the other party.

**[SIGNATURES COMMENCE ON THE NEXT PAGE]**

      **IN WITNESS WHEREOF**, Buyer has executed this Agreement as of the date first written above.

                              **SELLER**:

                              **THE MEN'S WEARHOUSE, INC.,** a Texas corporation

                              By: _____

                              Name: _____

                              Title: _____

**IN WITNESS WHEREOF**, Seller has executed this Agreement as of the date first written above.

                              **BUYER:**

                              **MCCORVEY REAL ESTATE HOLDINGS, LTD.,**
                              a Texas limited partnership,

                              McCorvey Management, L.L.C., its general partner


                              By:_____
                              Name: Kristal McCorvey Crites
                              Title: Manager

## ESCROW AGENT'S ACCEPTANCE

The foregoing fully executed Agreement is accepted by the undersigned this _____ day of _____, 2020.  Escrow Agent hereby accepts the engagement to handle the escrow established by this Agreement in accordance with the terms set forth in this Agreement.

CHARTER TITLE COMPANY

By: _____

Name:_____

Title:_____

**EXHIBIT A**

**DEEDS**

**RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:**

The Williard Law Firm, L.P
1920 N. Memorial Way, Suite 207
Houston, Texas 77007
Attention: Steve M. Williard

**NOTICE OF CONFIDENTIALITY: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<u>**SPECIAL WARRANTY DEED**</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | §    KNOW ALL PERSONS BY THESE PRESENTS THAT: |
| COUNTY OF HARRIS | § |

For the consideration of Ten Dollars ($10.00) and other good and valuable considerations, **THE MEN'S WEARHOUSE, INC.**, a Texas corporation ("**Grantor**"), hereby grants, sells and conveys to **MCCORVEY REAL ESTATE HOLDINGS, LTD.**, a Texas limited partnership ("**Grantee**"), whose address is 8610 Wallisville Road, Houston, Texas 77029, the following described real property situated in  Harris County, Texas:

See legal description set forth in Exhibit A attached and incorporated by this reference (the "**Land**");

together with all improvements located on the Land (said Land and improvements being collectively referred to as the "**Subject Property**"); including any and all rights, title and interest of Grantor, if any, in and to oil, gas and other mineral rights pertaining to the Land.  Provided, however, Grantor waives the right of ingress and egress, and all other rights of any kind or character, to enter upon or to use the surface of the Subject Property relating to the portion of the mineral estate owned by Grantor. Nothing herein, however, restricts or prohibits the pooling or unitization of the portion of the mineral estate owned by Grantor with land other than the Subject Property; or the exploration or production of the oil, gas, and other minerals by means of wells that are drilled or mines that open on land other than the Subject Property but enter or bottom under the Subject Property, provided that these operations in no manner interfere with the

Exhibit A-1

surface or subsurface support of any improvements constructed or to be constructed on the Subject Property.

For the same consideration, Grantor hereby GRANTS, SELLS, and CONVEYS unto Grantee, without covenant or warranty express or implied, all of Grantor's right title and interest, if any, in (i) adjacent strips, gores, streets, roads, alleys and rights-of way, open or proposed, (ii) all water and water rights related to the Subject Property, (iii) all utilities and utility capacity related to the Subject Property, and (iv) all easements, rights-of-way and other rights appurtenant to the Subject Property or used in connection with the Subject Property.

This Special Warranty Deed is executed by Grantor and is accepted by Grantee subject to those matters expressly set forth or otherwise described in <u>Exhibit B</u> attached hereto and incorporated herein by reference for all purposes ("**Permitted Exceptions**").

TO HAVE AND TO HOLD the Subject Property together with all and singular, the rights and appurtenances thereto belonging or in any wise appertaining unto said Grantee and its successors and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Subject Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof when the claim is by, through, or under Grantor but not otherwise, subject to the Permitted Exceptions.

Ad valorem taxes for the year 2020 have been prorated between Grantor and Grantee through the date hereof and Grantee expressly assumes the payment of such taxes for such year and all subsequent years.

[SIGNATURE PAGE FOLLOWS]

Exhibit A-2

Dated this ____ day of _____, 2020.

**GRANTOR**:

**THE MEN'S WEARHOUSE, INC.,** a Texas corporation

By: _____
Name: _____
Title: _____

State of _____  §
§
County of _____  §

     This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, the _____, of The Men's Wearhouse, Inc., a Texas corporation on behalf of said corporation.

     Given under my hand and seal of office this _____ day of _____, 2020.

(Seal)

_____
Notary Public Signature

[ADD EXHIBIT A & EXHIBIT B]

Exhibit A-3

**EXHIBIT B**

**ESCROW INSTRUCTIONS**

1.      Escrow Agent is authorized to take all appropriate action necessary to comply with this Agreement.

2.      All money payable under this Agreement prior to Closing shall be paid to Escrow Agent, unless otherwise specified.  All funds received by Escrow Agent shall be deposited by Escrow Agent in a federally-insured account in a State or National Bank (FDIC insured) unless otherwise directed in writing by both Seller and Buyer.  Escrow Agent may not commingle the Earnest Money with other funds held in its "trustees account". Escrow Agent will invest the Earnest Money in an interest-bearing account meeting the above requirements if so directed by Buyer. Any interest earned on the Earnest Money shall be treated and reported as the income of Buyer (regardless of the ultimate disposition of the Earnest Money) and Buyer shall be responsible for paying all taxes on any interest earned on the Earnest Money, which obligation shall survive the Closing.

3.      Disbursement of funds from Escrow Agent to Seller or Buyer shall be made by wire transfer. Unless otherwise specified by a party, disbursement of any funds to any payee other than Seller or Buyer may be made by check of Escrow Agent. Escrow Agent shall be under no obligation to disburse any funds represented by check or draft and no check or draft shall be payment to Escrow Agent in compliance with any of the requirements hereof until it has commercially reasonable assurance that such check or draft has been or will be honored.

4.      Any party seeking release or disbursement of the Earnest Money prior to Closing shall make written demand therefor upon both Escrow Agent and the other party. If Escrow Agent intends to release the Earnest Money to either party pursuant to this Agreement, then Escrow Agent shall give to the other party not less than five (5) Business Days prior written notice of such fact and if Escrow Agent receives written notice during such five (5) Business Day period that such other party objects to the release, then unless Escrow Agent concludes in its reasonable discretion that such objection is without merit under the applicable provisions of this Agreement, Escrow Agent shall not release the Earnest Money and any such dispute shall be resolved as provided herein. Escrow Agent shall promptly notify both parties of any actual release of the Earnest Money. All notices shall be provided as required under the notice provisions of this Agreement.

5.      When this Agreement and all title requirements have been complied with (including without limitation all conditions set forth in any closing instructions agreed to by Escrow Agent), Escrow Agent shall deliver, file or record in the appropriate public office all necessary documents, disburse all funds and instruct the title company to issue the appropriate title insurance policy(ies).

6.      Escrow Agent may for reasonable cause resign upon ten (10) days written notice to the parties; provided that Escrow Agent shall transfer the Escrow together with all documents and funds to an escrow agent acceptable to both Seller and Buyer, or if Seller and Buyer cannot

agree upon an acceptable escrow agent, then Escrow Agent shall have the right to resign and interplead all funds and documents to a court of competent jurisdiction.

7.      Escrow Agent may at its election, in the event of any conflicting demands made upon it concerning the Agreement where this Agreement does not clearly specify the course of action Escrow Agent is required to take, hold any money and documents deposited hereunder that are the subject of such conflict until it receives mutual instructions by all parties or until a civil action shall have been concluded in a court of competent jurisdiction, determining the rights of the parties. In the alternative, in such situation Escrow Agent may, at its discretion, commence a civil action to interplead any conflicting demands to a court of competent jurisdiction.

8.      Escrow Agent shall be entitled to rely upon any judgment, certification, demand or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein, the propriety or validity thereof, or the jurisdiction of a court issuing any such judgment. Escrow Agent may act in reliance upon (x) any instrument or signature believed to be genuine and duly authorized, and (y) advice of counsel in reference to any matter or matters connected therewith.

9.      Escrow Agent shall have no liability whatsoever arising out of or in connection with its activity as escrow agent except in the case of its negligence or willful misconduct or a breach by Escrow Agent of these Escrow Instructions and Seller and Buyer jointly and severally agree to indemnify and hold harmless Escrow Agent from all loss, cost, claim, damage, liability and expenses (including reasonable attorneys' fees) which may be incurred by reason of its acting as escrow agent unless caused by Escrow Agent's negligence or willful misconduct or a breach by Escrow Agent of these Escrow Instructions.

10.      If escrow fails to close because of Seller's default, Seller shall be liable for any cancellation charges of Escrow Agent.  If escrow fails to close because of Buyer's default, Buyer shall be liable for any cancellation charges of Escrow Agent. If escrow fails to close for any other reason, Seller and Buyer shall each be liable for one-half of any cancellation charges of Escrow Agent.

11.      The provisions of these Escrow Instructions shall survive the Closing or, if the Closing does not occur, any termination of this Agreement.

Exhibit B-2

4823-3796-4655.1

**EXHIBIT C**
**ASSIGNMENT AND ASSUMPTION OF LEASES**

**THIS ASSIGNMENT AND ASSUMPTION OF LEASES** (this "**Assignment** ") is made as of the _____ day of _____, 2020 (the **Effective Date**"), between **THE MEN'S WEARHOUSE, INC.**, a Texas limited liability company, ("**Assignor**") and **MCCORVEY REAL ESTATE HOLDINGS, LTD.**, a Texas limited partnership ("**Assignee**").

WHEREAS, Assignor is transferring Assignor's interest in and to the real property described on Exhibit A attached hereto (the "**Property**") to Assignee as of the Effective Date pursuant to an Agreement of Purchase and Sale dated _____, 2020 (the "**Purchase Agreement**"); and

WHEREAS, Assignor is presently the holder of the landlord's interest under the leases, as amended (collectively, the "Leases"), listed on Exhibit B attached hereto and by this reference incorporated herein, which Leases affect the Property.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.    Assignment.  As of the Effective Date, Assignor hereby assigns, conveys, transfers and sets over unto Assignee all of Assignor's right, title and interest in, to and under the Leases arising from and after the Effective Date, including without limitation all of Assignor's right, title and interest in and to any security or other deposits, all rents and other charges payable under the Leases, and any other rights arising under the Leases from and after the Effective Date. Assignor hereby expressly retains the right to enforce any indemnity, insurance or comparable obligations of the tenants under the Leases relating to claims or other events arising or occurring prior to the Effective Date; provided, however, that Seller may not seek as a remedy in any litigation against a tenant the termination of any lease or the dispossession of any tenant.

2.    Assumption.  Assignee hereby accepts the foregoing assignment of the Leases and hereby assumes all duties and obligations of Assignor under the Leases to the extent such duties and obligations arise or accrue from and after the Effective Date.

3.    Indemnification. Assignor shall defend, indemnify and hold harmless Assignee from and against any and all Claims asserted against or incurred by Assignee as a result of any acts or omissions, which arise or accrue prior to the Effective Date, in connection with the Leases assigned herein.  Assignee shall defend, indemnify and hold harmless Assignor from and against any and all Claims (as hereinafter defined) asserted against or incurred by Assignor as a result of any acts or omissions, which arise or accrue from and after the Effective Date, in connection with the Leases assigned herein. "Claims" means claims, demands, causes of action, losses, damages, liabilities, judgments, costs and expenses (including attorneys' fees, whether suit is instituted or not).

4.    Binding Effect.  This Assignment shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.  This Assignment is executed

Exhibit C-1

and delivered pursuant to, and is subject to the applicable terms and conditions of, the Purchase Agreement.

5.      Governing Law.   This Assignment shall be governed by and construed in accordance with the laws of Texas applicable to contracts made and performed entirely therein.

6.      Counterparts.   The parties agree that this Assignment may be executed by the parties in one or more counterparts and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit C-2

**IN WITNESS WHEREOF**, Assignor and Assignee have caused this Assignment to be duly executed on the day and year first above written:

**ASSIGNOR**:

**THE MEN'S WEARHOUSE, INC.,** a Texas corporation

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

**MCCORVEY REAL ESTATE HOLDINGS, LTD.**, a Texas limited partnership,

McCorvey Management, L.L.C., its general partner

By: _____
Name: Kristal McCorvey Crites
Title: Manager

EXHIBIT A   **LEGAL DESCRIPTION**
EXHIBIT B   **LEASES**

Exhibit C-3

**EXHIBIT D**

**ASSIGNMENT OF CONTRACTS, WARRANTIES, GUARANTIES,
PERMITS AND LICENSES**

**THIS ASSIGNMENT OF CONTRACTS, WARRANTIES, GUARANTIES, PERMITS AND LICENSES** (this "**Assignment**") is made and entered into as of this ___ day of _____, 2020, by **THE MEN'S WEARHOUSE, INC.**, a Texas corporation ("**Assignor**") to **MCCORVEY REAL ESTATE HOLDINGS, LTD.**, a Texas limited partnership ("**Assignee**").

**FOR GOOD AND VALUABLE CONSIDERATION**, the receipt of which is hereby acknowledged, effective as of the date hereof, to the extent the same is assignable Assignor hereby assigns and transfers unto Assignee all of its right, title, claim and interest in and under:

(a)     All warranties and guaranties made by any third party for the benefit of Seller or received by Seller from any third party with respect to any building, building component, structure, fixture, machinery, equipment, or material situated on, contained in any building or other improvement situated on, or comprising a part of any building or other improvement situated on, any part of that certain real property described on Exhibit A attached hereto (collectively, the "**Warranties**");

(b)     All of the service contracts listed in Exhibit B attached hereto (the "Service Contracts"); and

(c)     Any Permits and Licenses (as defined in that certain Agreement of Purchase and Sale by and between Assignor and Assignee dated as of September ___, 2020 (the "Purchase Agreement").

ASSIGNOR AND ASSIGNEE FURTHER HEREBY AGREE AND COVENANT AS FOLLOWS:

1.     Assignee hereby accepts and agrees to perform and observe all of the terms, covenants, conditions and agreements relating to or arising out of the Service Contracts with respect to all matters arising or accruing on or after the date hereof.

2.     This Assignment shall not be construed as a representation or warranty by Assignor as to the transferability of the Warranties, the Service Contracts or the Permits and Licenses (collectively, the "Interests"), and Assignor shall have no liability to Assignee in the event that any or all of the Interests (a) are not transferable to Assignee or (b) are canceled or terminated by reason of this Assignment or any acts of Assignee.

3.     This Assignment is made without recourse and without any express or implied representation or warranty of any kind, except as may be expressly set forth in the Purchase Agreement.

4.      This Assignment shall be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in entirely therein.

5.      This Assignment shall be binding on and inure to the benefit of the parties hereto, and their respective successors in interest and assigns.

6.      The parties agree that this Assignment may be executed by the parties in one or more counterparts and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit D-2

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment the day and year first above written.

ASSIGNOR:

**THE MEN'S WEARHOUSE, INC**., a Texas corporation

By: _____

Name: _____

Title: _____

**ASSIGNEE:**

**MCCORVEY REAL ESTATE HOLDINGS, LTD.,** a Texas limited partnership,

McCorvey Management, L.L.C., its general partner

By: _____

Name: Kristal McCorvey Crites

Title: Manager

EXHIBIT A   **LEGAL DESCRIPTION**
EXHIBIT B   **LIST OF SERVICE CONTRACTS**

Exhibit D-3

# EXHIBIT E
# ESTOPPEL CERTIFICATE

| | |
|---|---|
| **Landlord:** | **THE MEN'S WEARHOUSE, INC., a Texas corporation ("Landlord"), 6830 Rogerdale Rd, Houston, Texas 77072** |
| **Buyer:** | **MCCORVEY REAL ESTATE HOLDINGS, LTD., a Texas limited partnership ("Buyer"), 8610 Wallisville Road, Houston, Texas 77029** |
| **Lender:** | **_____, a _____ ("Lender), _____, _____, _____ _____** |
| **Tenant:** | **_____ d/b/a _____ ("Tenant"), _____ and ("Guarantor")** |
| **Leased Premises:** | **Suite_____ containing approximately 0 rentable square feet {the "Premises") at (Address) (the "Property") more particularly described in the Lease {the "Leased Premises")** |
| **Lease:** | **The Lease Agreement dated_____. The First Amendment dated_____. The Second Amendment dated _____.** |

Tenant hereby certifies to Landlord, Buyer and Lender and agrees as follows:

1.      Tenant is the tenant/lessee under the Lease. Attached hereto as **(Exhibit A)** is a true, correct and complete copy of the Lease, including any amendments thereto.

2.      The Lease is in full force and effect and has not been amended, modified or supplemented except as specifically set forth in attached (**Exhibit A**), and constitutes the entire agreement between Landlord and Tenant with respect to the Leased Premises. There are no other agreements between Landlord and Tenant with respect to the Leased Premises.

3.      The Tenant has accepted full possession and taken occupancy of, and is open and conducting business in, the entire Leased Premises described in the Lease.

4.      The commencement date of the term of the Lease is _____ and the expiration date of the term of the Lease is _____. The Tenant has no rights to renew or extend the term of the Lease except as follows: _____ _____ [*if none, state "none"*]. Except as may be provided in the Lease in connection with (a) a casualty, (b) a condemnation or (c) a default by the Landlord, the Tenant has no right to terminate the Lease or "go dark" except as follows: _____ _____[*if none, state "none"*].

Exhibit E-1

5.      Neither Landlord nor Tenant is in default under the Lease. There are no defenses, offsets, claims or counterclaims by or in favor of Tenant against Landlord under the Lease or against the obligations of Tenant under the Lease.

6.      Tenant has no claim against Landlord and no offset or defense to enforcement of any of the terms of the Lease.

7.      Tenant has not received any notice of and is not aware of any transfer, assignment, hypothecation or pledge by Landlord of any of Landlord's interest in the Lease.

8.      Tenant has not assigned the Lease and has not subleased the Leased Premises or any part thereof, except as follows_____ [*provide copies of any assignment/sublease documentation or if none, state "none"*].

9.      Fixed or base rent payable by Tenant is currently payable under the Lease in the amount of $____ per month and no such rent has been paid more than 30 days in advance of its due date, except for the first month's rent.  Tenant's security deposit is $_____.

10.      Additional rent (including Tenant's share of common area maintenance, tax and insurance charges) payable by Tenant is presently **$**____ per month and no such rent has been paid more than 30 days in advance of its due date. Landlord has no obligation to reimburse Tenant for any additional rent, except **$**_____[*if none, state "none"*].

11.      There are no actions, voluntary or otherwise, pending or, to the best knowledge of Tenant, threatened against Tenant under bankruptcy, reorganization, moratorium or similar laws of the United States, any state thereof or any other jurisdiction.

12.      All work to be performed by Landlord under the Lease has been completed in accordance with the Lease and has been accepted by Tenant, and all reimbursements and/or allowances due to Tenant under the Lease in connection with any work performed by Landlord and/or by Tenant have been paid or credited in full.

13.      Tenant has no right or option pursuant to the Lease or otherwise to purchase all or any part of the Leased Premises or the Property.  Tenant does not have any right or option for additional space in the Property.

14.      There are no guarantors for the Lease, except _____.

[*Signature Page Follows*]

Exhibit E-2

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Estoppel Certificate with the knowledge and understanding that the statements contained herein may be relied upon by the Landlord under the Lease, any purchaser or transferee of the Property and/or Landlord's interest in the lease, any lender of any of the foregoing, and their respective successors, assigns and legal representatives.

Dated this _____ day of _____, 2020.

**TENANT:**

_____

By: _____

Name: _____

Title: _____

**[Add Exhibit A for Lease]**

Exhibit E-3

**EXHIBIT F**

**FORM OF NOTICE TO TENANT NOTICE TO TENANT**

_____, 2020

[address to Tenant
pursuant to Notice
Provisions in Lease]
_____

Dear Tenant:

You are hereby notified that **THE MEN'S WEARHOUSE, INC.** ("**Seller**"), as owner of the Property which you are occupying under your lease (the "**Lease**"), has sold the Property to **MCCORVEY REAL ESTATE HOLDINGS, LTD.**, ("**Buyer**") as of the date of this Notice set forth above, and in connection with such sale Seller has assigned and transferred its interest in the Lease and any and all security deposits thereunder or relating thereto to Buyer, and Buyer has assumed and agreed to perform all of Seller's obligations under the Lease (including any obligations set forth in the Lease to repay or account for any security deposits thereunder) from and after such date. Accordingly, (a) all of your obligations under the Lease from and after the date of this Notice (including your obligation to pay rent) shall be performable to and for the benefit of Buyer, its successors and assigns and (b) all of Seller's obligations under the Lease (including any obligations to repay or account for any security deposits thereunder) from and after the date of this Notice shall be the binding obligations of Buyer and its successors and assigns. The current amount of the security deposit being held by Buyer with respect to the Lease is $_____.

The address of Buyer for all purposes under the Lease (including the payments of rentals, the recoupment of any security deposits and the giving of any notices provided for in the Lease) is:

McCorvey Real Estate Holdings, Ltd.
c/o Kristal McCorvey Crites
8610 Wallisville Road
Houston, Texas 77029

Please instruct your insurance carrier to provide Buyer a new certificate of insurance listing "McCorvey Real Estate Holdings, Ltd., a Texas limited partnership" as an additional insured.

Exhibit F-1

Thank you very much for your assistance in this matter.

Very truly yours,

**THE MEN'S WEARHOUSE, INC.**
a Texas corporation


By: _____
Name: _____
Title: _____


AGREED TO AND ACCEPTED:

"Buyer"

**MCCORVEY REAL ESTATE HOLDINGS, LTD.,**
a Texas limited partnership,

      McCorvey Management, L.L.C., its general partner


By: _____
Name: Kristal McCorvey Crites
Title: Manager

Exhibit F-2

**SCHEDULE 2.1.1**

**PROPERTY DESCRIPTION**

**LEGAL DESCRIPTION FOR 5803 GLENMONT DRIVE:**

Attached

**LEGAL DESCRIPTION FOR 5630 RENWICK DRIVE:**

Attached

**SCHEDULE 6.1(f)**

**LEASING COMMISSION AGREEMENTS**

None, except for the obligations set forth in Section 6.5