**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| TAILORED BRANDS, INC., *et al.*,[1] | ) Case No. 20-33900 (MI) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) (Emergency Hearing Requested) |

**DECLARATION OF JAMIE BAIRD IN SUPPORT OF THE DEBTORS' EMERGENCY MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) AUTHORIZING THE DEBTORS TO OBTAIN EXIT FINANCING, (IV) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (V) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (VI) MODIFYING THE AUTOMATIC STAY, (VII) SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF**

I, James H. Baird, hereby declare as follows under penalty of perjury as follows:

1.  I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Authorizing the Debtors to Obtain Exit Financing, (IV) Granting Liens and Providing Superpriority Administrative Expense Status, (V) Granting Adequate Protection to the Prepetition Secured Parties, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "Motion"),[2] filed contemporaneously herewith, which, as set forth in the

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/TailoredBrands. The location of the Debtors' service address in these chapter 11 cases is: 6100 Stevenson Boulevard, Fremont, California 94538.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Holly Etlin, Chief Restructuring Officer of Tailored Brands, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the

Motion, seeks (a) approval of access to a $500 million senior secured ABL revolving credit facility provided by the Prepetition ABL Lenders, which includes a $150 million sublimit for the issuance of letters of credit, a "roll-up" of the existing letters of credit issued under the Prepetition ABL Facility, and a refinancing of the existing obligations under the Prepetition ABL Facility (the "<u>DIP Facility</u>"), (b) authorization for (i) the immediate use of the cash collateral of the Prepetition ABL Lenders (the "<u>Prepetition ABL Cash Collateral</u>") and (ii) the use of the cash collateral of the Prepetition Term Loan Lenders (the "<u>Term Loan Segregated Cash</u>," and together with the Prepetition ABL Cash Collateral, the "<u>Cash Collateral</u>") in accordance with certain milestones set forth in the Interim Order, and (c) authorizing the conversion of the DIP Facility into the Exit ABL Facility upon emergence from chapter 11, subject to the Debtors meeting certain conditions.[3]

2. Based on my professional experience and as explained below, the DIP Facility, including the potential conversion thereof into the Exit ABL Facility: (a) is the product of arm's-length, good-faith negotiations; (b) is, in light of the marketing process described below, the best presently available postpetition financing option for the Debtors; and (c) contains reasonable financial terms and conditions under the circumstances.

3. The statements in this Declaration are, except where specifically noted, based on my personal knowledge of information that I have obtained from the Debtors and their other advisors, the Debtors' books and records, information learned from my review of relevant documents related thereto, and employees of PJT Partners LP ("<u>PJT</u>") working directly with me

---

United States Code (the "<u>Bankruptcy Code</u>"), on August 2, 2020 (the "<u>Petition Date</u>"). Capitalized terms used but not otherwise defined in this Declaration shall have the meanings given to them in the First Day Declaration or in the Motion.

[3] Any description of the proposed terms of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Agreement.

2

and under my supervision. Specifically, PJT has been one of the principal advisors for the Debtors since March 2020, and, in that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings. I am not being specifically compensated for this testimony other than through payments to be received by PJT (including certain financing fees) as a professional whose retention the Debtors are seeking to obtain this Court's approval of pursuant to an application to be filed with the Court at a later date.[4] I am over the age of 18 years and authorized to submit this declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background and Qualifications

4. I am a Partner in the Restructuring and Special Situations Group at PJT, a global investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017. Prior to joining PJT, I joined the restructuring group of The Blackstone Group L.P. ("Blackstone") in 2002. In October 2015, Blackstone spun out its advisory units (including its restructuring group) to become part of PJT. Today, PJT has over 650 employees located in New York, San Francisco, Boston, Chicago, London, Hong Kong, and Madrid.

5. PJT and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings. The PJT restructuring professionals (including in their former capacity as Blackstone employees) have been particularly active in large, complex and high-profile bankruptcies and restructurings, including, among others: AbitibiBowater Inc.; Adelphia Communications Corporation; Arch

---

[4] Pursuant to PJT's engagement letter with the Debtors, subject to Court approval, PJT will be entitled to a $3.75 million capital raising fee in connection with the closing of the DIP Facility.

3

Coal, Inc.; Caesars Entertainment Operating Corporation; Cengage Learning, Inc.; Cumulus Media Inc.; Delta Air Lines, Inc.; Dynegy Inc.; Edison Mission Energy; Energy Future Holdings Corporation; Enron Corporation; Excel Maritime Carriers, Ltd.; EXCO Resources, Inc.; Flag Telecom Holdings Limited; Flying J. Inc.; FULLBEAUTY Brands Inc.; Genco Shipping & Trading Limited; Gibson Brands, Inc.; Global Crossing Ltd.; Houghton Mifflin Harcourt Publishing Company; iHeartMedia, Inc.; Lee Enterprises Inc.; LightSquared Inc.; Los Angeles Dodgers LLC; LyondellBasell Industries; NewPage Corporation; Noranda Aluminum, Inc.; Patriot Coal Corporation; Quiksilver, Inc.; Rue21, Inc.; School Specialty, Inc.; SemGroup; The Star Tribune Company; TerreStar Networks Inc.; Tribune Company; Walter Energy, Inc.; W.R. Grace & Co.; and Winn-Dixie Stores, Inc.

6. I have a Masters of Business Administration with a concentration in finance from Columbia Business School and an A.B. from Bowdoin College. I have over 18 years of experience working with distressed companies, including advising both debtors and creditors in chapter 11 cases and in out-of-court restructurings. During the past 18 years, I have worked on numerous financings for troubled companies, including debtor-in-possession financings. In addition, as a finance and restructuring professional, I closely follow developments in the financial markets and, in particular, the credit markets and keep abreast of the terms of current financing transactions in distressed and bankruptcy situations.

**PJT Retention**

7. In March 2020, the Debtors engaged PJT to act as the Debtors' investment banker with respect to any restructuring transaction, financing transaction, and/or sale transaction. Since the beginning of its engagement, PJT has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring efforts and has

4

become well-acquainted with the Debtors' capital structure, financing needs, and business operations.

### The Debtors' Prepetition Capital Structure

8. As noted in the First Day Declaration, as of the Petition Date, the Debtors had approximately $1.4 billion in total principal funded obligations, consisting of approximately $375 million under the Prepetition ABL Facility (plus approximately $23 million of outstanding letters of credit), approximately $877 million under the Prepetition Term Loan, and approximately $174 million under the Senior Notes.

9. As noted in the First Day Declaration, the obligations under the Prepetition ABL Facility are secured by all or substantially all of each of the Debtors' working capital assets, including, without limitation, by a first priority lien on the Debtors' accounts (including receivables), inventory, deposit accounts, security accounts, cash and cash equivalents.[5] I also understand that certain of the Debtors have jointly and severally guaranteed all U.S. borrowing obligations under the Prepetition ABL Facility.[6] My understanding is that the obligations under the Prepetition Term Loan are secured on a senior basis by a first priority lien on a significant portion of the assets of the Debtors, subject to certain exceptions and limitations set forth in the Prepetition Term Loan Documents.

### The DIP Marketing Process

10. In July 2020, the Debtors directed PJT to begin contacting parties regarding the terms of potential debtor-in-possession financing facilities that would provide the Debtors with

---

[5] *See* First Day Decl. ¶ 47.

[6] *See id.*

sufficient liquidity to stabilize operations, protect their supply chain, and position the Debtors for a successful comprehensive restructuring process.

11. PJT recognized that it would be particularly difficult to secure the DIP financing required to fund these chapter 11 cases and ongoing operations during the COVID-19 pandemic. Uncertainty related to store re-openings, customer traffic, continuation of professional office closures and regulations prohibiting large group gatherings such as weddings increased the difficulty of seeking new capital. Moreover, although economic activity in certain states showed signs of recovery, the ultimate progression of COVID-19 was (and remains) uncertain, which would leave any lender vulnerable to another full or partial shutdown at an unpredictable time in the future.

12. Notwithstanding these obstacles, in the weeks prior to the Petition Date, the Debtors, with the assistance of PJT, undertook a competitive marketing process for the DIP and exit facilities that involved both parties within as well as parties outside of the Debtors' existing capital structure. In particular, the Debtors prioritized a senior, asset based revolving DIP facility that refinanced the Debtors' Prepetition ABL Obligations using the same collateral as the Debtors' Prepetition ABL Obligations. With this in mind, and in parallel with discussions with the Prepetition ABL Agent, in July, at the direction of the Debtors, PJT began reaching out to parties with the requisite experience and sophistication to participate in such a facility. In my experience, potential providers of asset-based revolving DIP facilities are generally traditional banks and credit funds, among other financial institutions, who are familiar with the chapter 11 process and who can move quickly to close a transaction.

13. In total, 28 independent third-party capital providers were contacted and 15 non-disclosure agreements were executed. 14 parties subject to NDAs were granted access to a

virtual data room containing detailed information regarding the Debtors and received access to non-public information. As a result of these efforts, seven potential lenders engaged in discussions and two potential lenders requested further diligence materials that were promptly provided and/or held diligence calls with the Debtors and their advisors and discussed the terms of potential DIP financing. The Debtors ultimately received one indication of interest from a party outside of the Debtors existing capital structure for an asset-based revolving DIP facility. Such indication of interest did not provide better economic terms to the Debtors compared to the DIP Facility.

14. In addition, PJT discussed the release of the Term Loan Segregated Cash with the Term Loan Lenders to minimize costs to the estate and enhance the Debtors' liquidity. After a lengthy negotiating process, the Term Loan Lenders consented to the release of the Term Loan Segregated Cash which is subject to the Cash Collateral Motion. PJT also continued to explore options by discussing potential DIP financing with certain holders of the Unsecured Notes on a junior basis to the existing liens on the ABL Collateral and Term Loan Collateral. These holders did not express an interest in providing junior financing. In addition, no other party was willing to provide financing to the Debtors on a junior lien or an unsecured basis.

15. As a result, leading up to the Petition Date, it became clear to the Debtors that their best path to financing their chapter 11 cases was through a financing facility from the Prepetition ABL Lenders. As noted in the Motion, the DIP Facility contemplates postpetition financing in the form of a $500 million senior secured ABL revolving credit facility provided by the Prepetition ABL Lenders, as well as a $150 million sublimit for the issuance of letters of credit. Because the Prepetition ABL Facility is being refinanced in full, the DIP Facility does not prime the Prepetition ABL Lenders' liens on their collateral under the Prepetition ABL Facility. Therefore, the Debtors avoid any need to engage in a priming fight at the outset of these chapter 11 cases. Moreover, the

7

DIP Agreement provides for the conversion of the DIP Facility to an Exit ABL Facility upon emergence from chapter 11, subject to the Debtors meeting certain conditions. This conversion provides the Debtors with a clear path to emergence, setting the stage for a successful restructuring and minimizing costs associated with potential business disruption due to a lack of exit financing. The conversion would also avoid the incurrence of additional costs that would be incurred on account of an exit financing marketing process that would otherwise be due if the Debtors separately sought exit financing at a later date. In connection with entry into such DIP Facility, the Prepetition ABL Secured Parties have also consented to the immediate access by the Debtors to their Cash Collateral upon entry of the Interim Order.

16. The DIP Facility will be used to refinance the outstanding indebtedness under the Prepetition ABL Facility in full and contemplates a "roll up" of the letters of credit issued thereunder, each upon entry of the Interim Order. Specifically, among other uses, the Debtors intend to make borrowings under the DIP Facility to pay down any outstanding obligations under the Prepetition ABL Facility and then make borrowings under the DIP Facility to support their ongoing restructuring and operational needs. In my experience, such refinancing and "roll-ups" of letters of credit are not unusual in the distressed retail space, and in this case, the refinancing of the Prepetition ABL Facility and roll-up of letters of credit issued thereunder provides certain benefits to the Debtors and their estates. Upon approval of the interim order, the Debtors are expected to have approximately $147 million of total liquidity at the end of the week beginning August 3, 2020. Moreover, the letters of credit that were issued under the Prepetition ABL Facility will be rolled-up under the DIP Facility, which avoids the need for the Debtors to cash collateralize or otherwise replace, backstop, or adequately protect those obligations at a time when liquidity is at a premium. In addition, because the Prepetition ABL Secured Parties have agreed to support

8

the Debtors by participating in the DIP Facility and to consent to the use of their cash collateral in connection with this postpetition financing, the Debtors will be able to avoid litigation at the outset of these cases when their efforts are focused on working toward a consensual and constructive reorganization to maximize the recoveries to all creditors. Given these considerations as well as the Debtors' liquidity concerns and the case timeline, I believe that reducing litigation and entering the chapter 11 cases with collaboration between and among the Prepetition Secured Parties and the Debtors is critical to a smooth transition into chapter 11.

17. In addition, I believe that it is in the best interests of the Debtors and the estates to obtain the flexibility provided by the ability of the DIP Facility to potentially convert into an Exit ABL Facility upon emergence from chapter 11. If the DIP Facility converts to the Exit ABL Facility, the DIP Facility will obviate the need to run another exit financing marketing process prior to emergence and, more importantly, provide a greater degree of certainty to the Debtors' employees, creditors, and suppliers. This mechanism will not only reduce the Debtors' costs but will also allow the Debtors' management to focus on other key aspects of emerging from chapter 11.

18. In light of the marketing process described herein, I believe that the DIP Facility, including its potential conversion into the Exit ABL Facility, and access to Cash Collateral represents the best available financing package currently available to the Debtors that (a) provides the Debtors liquidity to refinance the indebtedness under the Prepetition ABL Facility; (b) provides the Debtors liquidity to fund these chapter 11 cases, while simultaneously providing flexibility to implement the restructuring; (c) gives the Debtors a timeline to complete their restructuring that the Debtors believe is reasonable under the circumstances; and (d) foregoes the need for a "priming" fight with the Prepetition ABL Secured Parties. I also believe that, given the

circumstances of these cases, the economic terms of the proposed DIP Facility are competitive and within the range of other postpetition financing facilities that I have observed or been involved with recently. The DIP Orders also contain certain milestones (the "Case Milestones") that the Debtors must meet throughout their chapter 11 cases. The Case Milestones were negotiated by the Prepetition Term Loan Lenders and the DIP Agent on behalf of the DIP Lenders as a condition to providing the DIP Facility and access to Cash Collateral and are anticipated to provide the Debtors with adequate time to implement a value-maximizing restructuring. Accordingly, I believe the Case Milestones are reasonable and appropriate under the circumstances and are consistent with other milestones that I have observed or been involved in recently.

19. I further believe the DIP Facility is the product of arm's-length, good-faith negotiations by the Debtors with the DIP Agent on behalf of the DIP Lenders. Based on the results of the marketing process described herein and PJT's conversations with potential lenders, I do not believe that workable alternative sources of financing with terms better than those of the DIP Facility, taken as a whole, are presently available to the Debtors.

**Fees in Connection with the DIP Facility**

20. I understand that the Debtors have agreed, subject to Court approval, to pay certain interests and fees to the DIP Lenders. In particular, as noted in the DIP Motion, the Debtors have agreed to pay interests and fees consisting of the following:[7]

a. ***Interest Rate.*** The Borrowers shall pay interest at a rate, at the DIP Borrower's option, equal to the Base Rate or Canadian Prime Rate, as applicable, plus 1.50% per annum, or LIBOR or CDOR (in each case subject to a 0.75% floor), as applicable, plus 2.50% per annum, compounded monthly and payable monthly in cash in arrears.

---

[7] The summaries contained in this Declaration are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Declaration is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary but not otherwise defined have the meanings ascribed to them in the Motion or in the DIP Documents, as applicable.

b. *Unused Commitment Fee.* The Borrowers shall pay to the DIP Lenders a commitment fee equal to 0.30% on the average daily unused portions of the commitments under the $500 million DIP Facility, payable quarterly in cash in arrears.

21. I understand that the Fee Letters identifying certain fees negotiated with the DIP Agent on behalf of the DIP Lenders have also been filed under seal pending approval of the *Debtors' Emergency Motion Seeking Entry of an Order Authorizing the Debtors to File the Fee Letters Under Seal*, filed contemporaneously herewith. By their terms, the Fee Letters require the Debtors to keep the description of fees contained therein confidential. I understand that the DIP Agent and the DIP Lenders treat this information as highly sensitive and confidential. It is my understanding that it is of critical importance to the DIP Agent and the DIP Lenders that the details of the fee structures set forth in the Fee Letters be kept confidential so that competitors may not use the information contained therein to gain a strategic advantage over the DIP Agent and DIP Lenders in the marketplace.

22. These interest rates and fees were the subject of arms'-length and good-faith negotiations between the Debtors and the DIP Agent on behalf of the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the proposed DIP Agent on behalf of the DIP Lenders as consideration for the extension of postpetition financing. The Debtors exchanged numerous term sheets with the DIP Agent throughout the process, including several proposals to lower interest rates and fees. I believe the interest rates and fees are reasonable and appropriate under the circumstances and are within the range of other postpetition financing fees that I have observed or been involved in recently. Particularly, because the DIP Facility also provides for the potential conversion upon the Debtors' emergence from chapter 11 into the Exit ABL Facility, the fee structure is paid in consideration of financing extended not only during these Chapter 11 Cases but also for the period that is four years after the Petition Date.

Case 20-33900 Document 137 Filed in TXSB on 08/03/20 Page 11 of 13

23. I believe that the benefits provided by the DIP Facility significantly outweigh the fees incurred by the Debtors. In light of the marketing and negotiation process described herein, it is my view that the proposed DIP Facility represent the best presently available financing option for the Debtors under the circumstances.

## Conclusion

24. In sum, based on my experience and my involvement in assisting the Debtors with the marketing and negotiation of the DIP Facility in this matter, it is my view that the DIP Facility represents the best presently available postpetition financing option for the Debtors and contains terms that, taken as a whole, are reasonable given the circumstances. Further, I believe that the negotiation process was conducted at arm's-length and in good faith. The Debtors' marketing efforts, with the assistance of PJT, lead me to believe that there is no other potential financing option that would satisfy the Debtors' objectives on better terms.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: August 3, 2020  
New York, New York

*/s/ James H. Baird*

Name: James H. Baird  
Title: Partner  
       PJT Partners LP

Case 20-33900 Document 137-34 Filed in TXSB on 08/03/20 Page 13 of 13