

March 16, 2020

# SPOTLIGHT ON COVID-19

**HOULIHAN LOKEY**

## The Impact of COVID-19 on Impairment: Top Considerations for Businesses

DX-047

# The Impact of COVID-19 on Impairment:
# Top Considerations for Businesses

**March 16, 2020**

As a result of the continued downturn in global market conditions and the general business environment, impairment considerations may become an area of concern for many companies. As social distancing continues to disrupt businesses and supply chains, companies may need to review goodwill, indefinite-lived intangible assets, as well as other long-lived assets for impairment.

## Impairment Considerations

Accounting Standards Codification (ASC) 350-20-35-30 states that "goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount."

During the financial crisis in 2008–2009, the Securities and Exchange Commission provided examples of events that may indicate that an interim impairment test is necessary. They included:

- Negative current events or long-term outlooks for specific industries impacting the company as a whole or specific reporting units;
- Not meeting analysts' expectations or internal forecasts in consecutive periods or downward adjustments to future forecasts;
- Planned or announced plant closures, layoffs, or asset dispositions; or
- Market capitalization of the company below its book value.

Certain industries, such as hospitality and travel, have been hit hard by the recent effects of coronavirus, with much uncertainty around the severity and duration of the negative impact.

A review of the companies included in the Russell 2000 Index shows the recent market turmoil has resulted in a significant increase of companies with market capitalization below book value:



*Source: S&P Capital IQ*

Market capitalization below book value does not necessarily mean a triggering event has occurred that would result in an interim goodwill impairment analysis. However, one would expect that a meaningful percentage of companies trading below book value will need to evaluate their current situation. Keep in mind that the impairment test for goodwill occurs at the reporting unit level when it is more likely than not that the fair value of a reporting unit has declined, on an other than temporary basis, below its book value. When assessing the need to perform an interim impairment test, a company should consider the duration and the severity of the decline and the reasons for it. A decline related to an event that is expected to continue for an extensive period of time to detrimentally affect the company, combined with its market value below book value, will likely trigger a test.

If a company has not experienced a decline in cash flows and expects that it will continue to meet its projected cash flows in the future does not necessarily mean that a trigger event has occurred in light of a decline in market capitalization. However, many companies may need to reconsider their projected cash flows due to disruption in the global economy and the supply chain due to the heightened uncertainty. Furthermore, the current market environment may well result in higher required rates of return demanded by investors as will be discussed in the next section.

## Valuation Considerations

As stated by Houlihan Lokey's Portfolio Valuation and Fund Advisory Services practice last week, COVID-19 will likely increase the complexity of today's valuations, including the valuations underlying impairment testing. In addition to reviewing a company's projections and forecasts, the following are some items that may need to be considered in today's valuations:

- Companies and their valuation specialists should be careful not to mix and match implied forward valuation multiples. For example, if certain guideline public companies have revised earnings forecasts and others have not, the resulting implied forward multiples are mismatched. If a subject company has revised its earnings forecast but the guideline public companies have not, there is another mismatch. Ideally, the subject company and guideline public companies will all have forecasts under the same macro environment (i.e., with coronavirus impact).
- Current trailing multiples (e.g., EV/LTM EBITDA) may be more appropriate than forward multiples (e.g., EV/NFY EBITDA) if there is a mismatch in the availability of projected earnings. Companies or valuation specialists should be cognizant that there may still remain a mismatch in trailing multiples if the subject company's financials reflect a time period different from that of the guideline public companies. For example, a subject company's trailing EBITDA as of a current date may reflect one-quarter of the coronavirus impact, while the public companies have not yet reported their results for the most recent quarter (e.g., March 31, 2020).
- Borrowing costs may have changed. When deriving a discount rate (e.g., WACC), the use of stated cost of debt or published cost of debt with infrequent updates may understate the current actual cost of debt.
- Similarly, commonly used models that estimate the cost of equity, such as the capital asset pricing model (CAPM), may understate an enterprise's cost of equity. Beta is one of the biggest drivers in CAPM; however, beta is often calculated using historical data over an extended timeframe (e.g., often two to five years). As a result, a one- or two-month spike in observed data is not likely to have a significant impact on the calculation of cost of equity. Additional risk premiums may be appropriate. Specifically, the heightened volatility observed in the market is similar to that of the credit crisis in 2008–2009:



Figure 2. CBOE Volatility vs. S&P 500 (8/1/08 to 3/31/09)



*Source: S&P Capital IQ*

This heightened volatility would suggest that the required rate of return by investors may have increased and that an additional equity risk premium, or company-specific risk premium may be warranted.

# Control Premium and Market Capitalization Reconciliation

ASC 350-20-35-23 states that "substantial value may arise from the ability to take advantage of synergies and other benefits that flow from control over another entity." Accordingly, the market capitalization of an entity may not fully capture the fair value of the reporting units as a whole. However, the amount of a control premium in excess of a company's market capitalization can require a great deal of judgment. There is no "bright-line test" to determine the reasonableness of a control premium. As such, when reconciling the fair value of the reporting units to the market capitalization, the reasonableness of the implied control premium should be assessed based on the facts and circumstances of a particular situation.

When evaluating an appropriate control premium, it is important to consider recent trends in market capitalization, instead of a single day's market capitalization. In some cases, it may be reasonable to evaluate market capitalization over an appropriate period of time leading up to the date at which a company is testing for potential impairment.

The reasonableness of the implied control premium should be supported based on factors such as an evaluation of control premiums identified in comparable transactions, or the cash flows associated with obtaining control of a reporting unit. It is important to note that during extreme market conditions, companies' securities may be mispriced whereby the fundamental values of such companies remain intact. In those situations, one may observe elevated control premiums as exhibited by transactions closed during extreme market conditions. For instance, during the financial crisis in 2008-2009, elevated control premiums were observed in transactions:

|  | Premiums Paid | | |
| --- | --- | --- | --- |
|  | 1-Day | 5-Day | 1-Month |
| **Pre-Credit Crisis: 1/1/06 to 12/31/07** | | | |
| Median | 22.5% | 25.1% | 28.8% |
| Mean | 53.9% | 51.6% | 45.8% |
| **Post-Credit Crisis: 6/1/08 to 6/30/09** | | | |
| Median | 37.8% | 44.0% | 45.8% |
| Mean | 70.2% | 73.4% | 76.5% |

*Source: S&P Capital IQ*

Companies and valuation specialists should expect that the amount of evidence supporting their judgment would likely be expected to increase as any control premium increases.

Many companies will likely assess current events to determine if a triggering event has occurred, necessitating a formal review of impairment, in particular those companies currently trading below their book value. A review of all available information, and understanding the limitations and adjustments required of such information would follow. Irrespective of the end result, proper documentation is essential. Houlihan Lokey has assisted its clients through tough times of extreme volatility and exogenous events and is ready to assist you today. Please reach out to one of the Corporate Valuation Advisory Services team members below for more information.

**CONTACTS**



**Dimitri Drone**
*Managing Director*
Head of Corporate Valuation Advisory Services
DDrone@HL.com
646.259.7480



**Michael DeLuke**
*Managing Director*
MDeLuke@HL.com
214.220.8487



**Karen Miles**
*Managing Director*
KMiles@HL.com
310.788.5243



**Tomasz Stefanowski**
*Managing Director*
TStefanowski@HL.com
212.497.4272

Additional Contributors: Wallace Ng and Ben Chiu



Houlihan Lokey is a trade name for Houlihan Lokey, Inc., and its subsidiaries and affiliates, which include those in (i) the United States: Houlihan Lokey Capital, Inc., an SEC-registered broker-dealer and member of FINRA (www.finra.org) and SIPC (www.sipc.org) (investment banking services); Houlihan Lokey Financial Advisors, Inc. (financial advisory services); HL Finance, LLC (syndicated leveraged finance platform); and Houlihan Lokey Real Estate Group, Inc. (real estate advisory services); (ii) Europe: Houlihan Lokey EMEA, LLP, and Houlihan Lokey (Corporate Finance) Limited, authorized and regulated by the U.K. Financial Conduct Authority; Houlihan Lokey S.p.A.; Houlihan Lokey GmbH; Houlihan Lokey (Netherlands) B.V.; Houlihan Lokey (España), S.A.; and Houlihan Lokey (Corporate Finance), S.A.; (iii) the United Arab Emirates, Dubai International Financial Centre (Dubai): Houlihan Lokey (MEA Financial Advisory) Limited, regulated by the Dubai Financial Services Authority for the provision of advising on financial products, arranging deals in investments, and arranging credit and advising on credit to professional clients only; (iv) Singapore: Houlihan Lokey (Singapore) Private Limited, an "exempt corporate finance adviser" able to provide exempt corporate finance advisory services to accredited investors only; (v) Hong Kong SAR: Houlihan Lokey (China) Limited, licensed in Hong Kong by the Securities and Futures Commission to conduct Type 1, 4, and 6 regulated activities to professional investors only; (vi) China: Houlihan Lokey Howard & Zukin Investment Consulting (Beijing) Co., Limited (financial advisory services); (vii) Japan: Houlihan Lokey K.K. (financial advisory services); and (viii) Australia: Houlihan Lokey (Australia) Pty Limited (ABN 74 601 825 227), a company incorporated in Australia and licensed by the Australian Securities and Investments Commission (AFSL number 474953) in respect of financial services provided to wholesale clients only. In the European Economic Area (EEA), Dubai, Singapore, Hong Kong, and Australia, this communication is directed to intended recipients, including actual or potential professional clients (EEA and Dubai), accredited investors (Singapore), professional investors (Hong Kong), and wholesale clients (Australia), respectively. Other persons, such as retail clients, are NOT the intended recipients of our communications or services and should not act upon this communication.

hl.com